Lisa Faye Petak (CA Bar No. 300914)
lpetak@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Phone: (805) 456-1496
Fax: (805) 456-1497
*(additional counsel on signature page)*

Sabarish Neelakanta (*Pro Hac Vice Pending*)
sneelakanta@humanrightsdefensecenter.org
Daniel Marshall (*Pro Hac Vice Pending*)
dmarshall@humanrightsdefensecenter.org
Masimba Mutamba (*Pro Hac Vice Pending*)
mmutamba@humanrightsdefensecenter.org
**THE HUMAN RIGHTS DEFENSE CENTER**
P.O. Box 1151
Lake Worth, FL 33460
Phone: (561) 360-252
Fax: (866) 228-1681

*Attorneys for Plaintiff Joe Rudy Reyes and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JOE RUDY REYES, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>JPAY, INC.; SUNRISE BANKS NATIONAL ASSOCIATION; AND PRAXELL INC.,<br><br>       Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to this Court's jurisdiction conferred by 28 U.S.C. § 1331 (1980), Plaintiff Joe Rudy Reyes ("Plaintiff" or "Mr. Reyes"), on behalf of himself and all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendants JPay, Inc., Sunrise Banks National Association, and Praxell Inc. (together, "Defendants"). The following allegations are based on personal knowledge as to Plaintiff's conduct and are made on information and belief as to all other matters based upon the undersigned counsels' investigation.

## I.     INTRODUCTION

1.      Over the course of nearly thirty years in the California correctional system, Plaintiff Joe Rudy Reyes earned his Associate's Degree in social work and earned the trust of his fellow inmates and prison officials.  He was elected Chairman of the Inmate Advisory Council, where he served as an intermediary between prison officials and the prison population and helped transform prison policies regarding the treatment of disabled inmates.

2.      After serving his time, Mr. Reyes was paroled in January 2017, leaving Susanville, California's High Desert State Prison and vowing to use his freedom to develop rehabilitative programs within the California Department of Corrections and Rehabilitation ("CDCR") and to work with former gang members as part of Criminals

and Gang Members Anonymous.[1]

3.     When he was released on Monday, January 16, 2017, he was given his personal effects and the remaining balance of his inmate trust account, along with his California-provided release funds, or "gate money," of $200 to help him return home to Los Angeles.[2]   In total, Mr. Reyes had $424.20 to his name when he was released.

4.     Yet upon his release, the CDCR officers did not return this amount in cash. Instead, the CDCR gave him a prepaid debit card loaded with both the balance of his inmate trust account and his gate money.  The card was issued by Sunrise Banks National Association (hereinafter "Sunrise Bank") and bore the insignia "Progress," a brand of prepaid card offered by JPay, Inc. (hereinafter "JPay Card" or "Card").

5.     Mr. Reyes wanted to receive his cash back, but CDCR officers forced the prepaid JPay Card upon him without offering any alternatives. That Card required Mr. Reyes to pay unreasonable and excessive fees to Defendants in order to access his own money.  Mr. Reyes never assented to receiving the Card instead of his property and never assented to any contract with Defendants. CDCR did not give Mr. Reyes an opportunity to reject the JPay Card or take immediate possession of his money in any other form,

---

[1] *Solitary Confinement in the California Prisons*, UCLA SCHOOL OF LAW, https://law.ucla.edu/news-and-events/3449/2017/2/27/solitary-confinement-in-california-prison-c--history-and-experience/ (last visited Jan. 1, 2018).

[2] Cal. Penal Code § 2713.1; *see also* Kate J. Wilson, *State Policies and Procedures Re 'Gate Money'* at 2, CENTER FOR PUBLIC POLICY RESEARCH, UNIVERSITY OF CALIFORNIA, DAVIS, http://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/Gate_Money_Oct_2007.pdf (last visited Jan. 2, 2018).

such as cash.

6.      Mr. Reyes's experience is illustrative of the experience of thousands of other individuals who have received JPay Cards across the country.

7.      Mr. Reyes was literally a captive consumer for Defendants, and Defendants took full advantage of Mr. Reyes's complete lack of bargaining power by requiring him to pay various exorbitant, unreasonable fees to retrieve his own money and state-issued benefits.  Of course, Mr. Reyes never would have agreed to receive his money in the form of the expensive JPay Card if he had been given any choice or had any bargaining power.

8.      A CDCR correctional officer first used Mr. Reyes' JPay Card to purchase a bus ticket for Mr. Reyes shortly after his release.

9.      Mr. Reyes then attempted to use the Card at an ATM—but it was declined. Next, he successfully used the Card to buy additional bus and train tickets to return home to Los Angeles, as well as a prepaid cell phone and food for his journey.

10.     Once home in Los Angeles and just days after he received the Card, all his transactions were denied.  After calling the consumer service number located on the back of his JPay Card, which routed him to representatives from Praxell, Inc., he was told his account was frozen due to suspected "suspicious activity."  They offered no basis for these suspicions.

11.     Praxell representatives told him he needed to provide a copy of his driver's license, then a copy of a utility or cell phone bill in his name, and then a signed and

notarized letter from his landlord before he could restore his account.

12.     After satisfying their ever-changing demands, he was then told he would need to contact CDCR to regain access to the balance of his JPay account.  No one told him why or how CDCR would be able to unfreeze his account.

13.     Mr. Reyes then asked the Warden of High Desert Prison—with whom he maintains a working relationship due to their cooperation as part of the Inmate Advisory Council—about regaining access to his JPay Card account.  The Warden insisted that the prison had no involvement with account maintenance, would not be able to assist him, and that JPay managed the release card accounts.

14.     On or before January 8, 2018, JPay closed Mr. Reyes' account.

15.     To date, he still does not have access to his account.  It has been nearly a year since he has been able to use the Card.

16.     Defendants have engaged in a pattern of unlawful, deceptive, unfair, and unconscionable profiteering and self-dealing with respect to the prepaid release Cards that they force upon individuals who are released from jails and prisons. In so doing, Defendants have violated the law, including the Fifth Amendment's prohibition against the taking of property without just compensation, the Electronic Fund Transfer Act, 15 U.S.C. §1693, *et seq.* (2010), and the California Unfair Competition Law, Cal. Bus. &

Prof. Code §§ 17200, *et seq.*, and California's common law actions for conversion, trespass to chattels, and for an accounting.

17.    As such, Mr. Reyes files this class action lawsuit to redress injuries that he and other individuals have suffered and continue to suffer as a result of Defendants' practices of forcing prepaid release Cards that carry unreasonable and excessive fees upon pretrial detainees and former inmates who, like most consumers, would never agree to receive the balance of their inmate trust accounts and gate money in such a manner if given a choice.

## II.    PARTIES

18.    **Plaintiff Joe Rudy Reyes** lives in this District and is a citizen of Sylmar, California.

19.    **Defendant JPay, Inc.** ("JPay"), a wholly owned subsidiary of Securus Technologies, Inc., is incorporated in Delaware and located at 12864 Biscayne Boulevard, Suite 243, Miami, Florida 33181. JPay touts itself as "the most trusted name in corrections" and offers myriad services to the correctional industry in over 30 states. JPay markets its prepaid Cards to government entities, including CDCR, and these entities in turn disseminate JPay's products to the general public. JPay contracted with CDCR to provide prepaid debit release Cards to prisoners released from California's prison facilities.

20.    **Defendant Sunrise Banks National Association** ("Sunrise Bank"), a subsidiary of University Financial Corp. that is incorporated in Minnesota, is a member

of the Federal Deposit Insurance Corporation and is both a member and board member of the Network Branded Prepaid Card Association.  Sunrise Bank has over $978 million in assets[3] and operates 6 locations throughout Minnesota, as well as an operational office with 26 employees dedicated to prepaid card services in Sioux Falls, South Dakota.[4]  Sunrise Bank "seeks to radically change the way urban communities and underserved people thrive by empowering them to achieve their aspirations"[5] and has contracted with JPay to issue prepaid debit Cards nationwide to released prisoners and is located at 200 University Avenue West, Saint Paul, Minnesota 55103.

21.    **Defendant Praxell, Inc.** ("Praxell") was founded in 1999, and is a private company offering cloud-based payment solutions for businesses and support services for custom prepaid card programs, including customer service for institutions using prepaid debit cards.  Card programs using Praxell's services are issued by Sunrise Banks National Association.  Praxell is incorporated under the laws of Delaware and is located at 54 West 39th Street, New York, New York 10018.

---

[3] iBanknet, http://www.ibanknet.com/scripts/callreports/getbank.aspx?ibnid=usa_860053 (last visited Jan. 1, 2018).
[4] *Sunrise Banks is a Prepaid Card Leader*, https://sunrisebanks.com/sunrise-banks-is-a-prepaid-card-leader/ (last visited Jan. 1, 2018).
[5] *Id.*

### III.   JURISDICTION AND VENUE

22.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (1980) because this is a civil action arising under the laws of the United States, namely 42 U.S.C. § 1983 (1996) and 15 U.S.C. § 1693, *et seq.* (2010).

23.   This Court may exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 (1994).

24.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 (2011) because each Defendant is subject to personal jurisdiction in this District, Mr. Reyes lives in this District, and a substantial part of the events or omissions giving rise to the claim occurred within this District.

### IV.   FACTS

**A.   Background**

25.   Over 650,000 individuals are released from state and federal prisons annually, and local jails nationwide process an estimated 11.6 million people each year.

26.   JPay is one of many for-profit businesses in an increasingly privatized prison industry.  State spending on corrections was over $52.4 billion in 2012. Hundreds of private-sector contractors now provide food, clothing, riot gear, phone service, computers, and health care, in addition to directly operating many correctional facilities.

27.   At least 10 companies, including JPay, now offer prepaid release cards to state and local correctional systems.

28.     JPay has been offering prepaid debit release card services to jails and prisons since at least 2006, and has provided these services for at least 16 state prison systems,[6] including California.  By 2014, and before JPay contracted with California, over half a million JPay prepaid debit release cards had been issued to released inmates.

29.     Defendants market and distribute their prepaid debit release cards to the general public and specifically market their products on their website.

30.     CDCR, like all jails, prisons, and detention facilities, keeps an individual's confiscated cash until his or her release.  These funds are kept with the understanding that the State will hold these funds in trust and protect the property on the individual's behalf.

31.     Traditionally, when inmates were released from jails, prisons, and other detention facilities, their jailers returned to them in the form of cash or check any money that the jailers confiscated at booking.  The jailers also traditionally returned to them, in the form of cash or check, any monies that had accrued or been added to in the individual's inmate trust account.

32.     According to a 2014 Association of State Correctional Administrators survey, government agencies across the United States that handle inmate funds are

---

[6] At the time CDCR contracted with JPay for its prepaid debit release card services, JPay offered the program for the state correctional facilities in Colorado, Michigan, Virginia, Florida, Missouri, Georgia, Nevada, Indiana, North Carolina, Louisiana, and Oklahoma. On information and belief, JPay now has contracts with at least three additional states, including New Jersey.

increasingly using prepaid debit cards to return personal funds to former inmates.  Over half of responding agencies reported using prepaid debit cards to return inmates' property, and a majority of those agencies reported that a fee is charged when using the debit card to get cash from a bank.[7]

33.    Unlike typical consumers, released individuals are not given the choice to accept a fee-laden financial product like the JPay Card, and they never fill out an application for this financial product.

34.    Moreover, the typical released individual suffers from poor financial literacy.  A study by the University of Arkansas-Little Rock Anderson Institute on Race and Ethnicity of inmates in Arkansas found that only 33.1 percent of inmates could correctly answer the question, "If you put $100 in a bank account paying 5 percent interest, how much will you have in your account after one year?"  In contrast, 79.6 percent of non-incarcerated men got the same question right.[8]

35.    Over two-thirds of states in the United States provide "gate money" to those released from a prison facility.[9]

_____

[7] *See Proposed Amendments to Reg. E: Curb exploitation of people released from custody*, PRISON POLICY INITIATIVE 2, March 18, 2015, https://static.prisonpolicy.org/releasecards/CFPB-comment.pdf (last visited Jan. 1, 2018).

[8] David Koon, *New UALR survey finds a lack of basic 'financial literacy' among inmates*, https://www.arktimes.com/arkansas/new-ualr-survey-finds-a-lack-of-basic-financial-literacy-among-inmates/Content?oid=3351524, June 19, 2017 (last visited Jan. 1, 2018).

[9] *See supra* note 2; *see also Gate Money by State*, HARD TIME: LIFE AFTER PRISON, http://americanradioworks.publicradio.org/features/hardtime/gatemoney/ (last visited Jan. 2, 2018).

36.     These funds are statutorily-conferred benefits.  In California, inmates who serve over six months in prison receive $200, less the costs of clothing, if needed.

37.     That Defendants market financial products rife with fees—all so released individuals can access their own money and their state-provided benefits—is predatory, unfair, and deceitful.

**B.      CDCR's Inmate Release Card Program**

**1.      JPay's Bid**

38.     Before contracting with JPay, CDCR issued the vast majority of inmate funds via cash, with some returns via check.

39.     CDCR chose to move to a debit-card-based property return system as a means of reducing accounting department staffing and overhead costs.  Without cash at each institution, CDCR claims it can reduce the amount of time spent processing transactions in the institution's accounting office, which frees staff to complete other work.

40.     CDCR's prior cash-based system required CDCR officers to count and reconcile cash, as well as manually review hardcopy records to confirm a releasee's receipt of his or her cash.  This process required CDCR officers to expend additional time and money.  Furthermore, CDCR facilities—especially those in far-flung locations in rural California—complained of costs in replenishing their cash storage.

41.     Yet one of CDCR's motives for switching to a debit-card-based system had nothing to do with cost-saving measures: the switch removed incentives for CDCR

officers to skim funds out of designated inmate cash accounts.  Officer theft resulted in at least 17 documented cash shortages resulting in losses of $15,200 between July 2012 and May 2014.  These shortages then had to be investigated internally, which again required CDCR to devote time and resources to the task.

42.    In May 2014, CDCR publicly requested bids from private contractors to offer prepaid debit release card services to replace the cash-based system.  Their request for bids mandated certain conditions, including those related to card accessibility and user fees.

43.    CDCR insisted that these services needed to be privatized because the debit card system it sought was "not available within civil service, cannot be performed satisfactorily by civil service, or are of such a highly specialized or technical nature that the necessary expert knowledge, experience and ability are not available through the civil service system."

44.    JPay was the only company to submit a bid.

45.    JPay insisted in its CDCR bid that it treats cardholders "with the utmost care" and that cardholders can reach one of their 100+ customer service representatives 24 hours a day.

46.    To better help cardholders track their Card balances and avoid insufficient funds fees, CDCR asked JPay to ensure that cardholders would receive an accounting of their balance at each point of sale transaction.  JPay insisted it could not fulfill that request, and the request was ultimately dropped.

47.     After accounting for the number of hours CDCR staff spend counting and verifying cash and other costs under the cash-based system versus the costs associated with a debit-card-based system, the agency calculated that it would save $878,533.20 a year by contracting with JPay.

48.     Moreover, the agency also calculated that it would cost $170,502.17 annually for CDCR staff to administer the JPay debit release Card program.  With 32,802 released inmates per year, the "cost per inmate" to administer the program would be $5.20.  Without the JPay contract, the "cost per inmate" would remain approximately $25.00 to $30.00.

49.     CDCR accepted JPay's bid and contracted with JPay in July 2014 for myriad correctional services, including lock boxes and electronic funds transfer services to facilitate deposits into inmate trust accounts, as well as a prepaid debit release card program at no cost to CDCR.

50.     Pursuant to that contract, Defendants enjoy a monopoly at all CDCR detention facilities.

51.     Under the JPay contract and its amendments, Defendants are to perform the traditional government service of returning money relinquished by inmates at booking.

52.     JPay contracts with Sunrise Bank as an issuing bank for its JPay-branded Cards, and with MasterCard as the payment network sponsor.

53.     Upon information and belief, prepaid card issuance agreements between banks and servicers like JPay provide for the marketing of prepaid cards to government

entities for distribution to released inmates, and reference the applicability of the Electronic Fund Transfer Act (15 U.S.C. §§ 1693, *et seq.*) and Regulation E thereunder (12 C.F.R. Part 205, each as may be amended from time to time) to those agreements.

54.     CDCR negotiated every line and term of its agreement with JPay.

55.     In an effort to achieve a cost-free program, CDCR accepted the JPay prepaid debit release Card program and acknowledged that costs associated with the program would be paid by releasees in the form of fees.

56.     In accepting JPay's bid, CDCR specifically negotiated JPay's Card usage fee schedule and required that the Card be cost-free to CDCR.

57.     JPay agreed to impose the following fee schedule on cardholders:

A.     $1.00 point-of-sale or ATM decline fee;

B.     $5.00 lost/stolen/damaged Card replacement fee;

C.     $3.00 "monthly maintenance fee," to be charged monthly with the first charge five days after the Card's activation; and

D.     $9.95 cancellation fee, whereby the account holder would receive their balance via check or money order.

58.     On information and belief, nothing in JPay's contract with CDCR prohibits Defendants from charging in-network ATM fees or fees for balance inquiries or transfers after the first four free transactions are completed.  Those fees, if imposed, are not disclosed in the contract.

59.     JPay's fee structure for CDCR was designed to match the agency's stated wishes in its request for bids—but not all fee structures for detention centers are the same.  In New Jersey, for example, JPay Cards come with a mandatory $2 weekly maintenance fee.[10]  North Carolina inmates face $6 monthly maintenance fees, and cardholders issued JPay Cards by correctional facilities in Colorado, Georgia, and Tennessee are charged $0.70 *per transaction*.  In addition to the account maintenance fees, cardholders in Tennessee and Michigan are penalized for not using their Card— their accounts are docked $2.99 if there is no account activity after 90 days.[11]

60.     Though JPay insists that its Cards are accepted everywhere and convenient for cardholders, the design of these products leaves balances that are absorbed by Defendants as fees.

61.     Cardholders must know their exact balance before making purchases, as any point-of-sale or ATM withdrawal for a cent over the balance will result in a $1.00 decline fee.

62.     If a cardholder uses the Card at an out-of-network ATM, he will be charged a fee from the processing bank.  If the account balance does not cover both the requested amount and the bank's fee, Defendants charge a decline fee.

---

[10] *Release the Power of Progress*, New Jersey Corrections, http://www.nj.gov/corrections/pdf/OTS/FRARA/JPAY/What%20is%20a%20JPAY%20release%20card%20-ENGLISH.pdf (last visited Jan. 1, 2018).

[11] *Proposed Amendments to Reg. E: Curb exploitation of people released from custody*, PRISON POLICY INITIATIVE, 4, https://static.prisonpolicy.org/releasecards/CFPB-comment.pdf (last visited Jan. 1, 2018).

63.     Nor can cardholders ensure that they avoid the monthly maintenance fee, as the clock starts ticking not on the day they received the Card, but on the day it was activated—which could have been days or weeks before they were ultimately released from custody.

64.     On information and belief, individuals who are deported after their arrest and released back in their home country, may not be able to access their funds at all— and then face a $1.00 decline fee each time they try.  Released individuals report that Cards and/or their PIN numbers do not work abroad, or that limits on international ATM withdrawals force them to accrue additional out-of-network withdrawal fees.

65.     CDCR also required that JPay provide customer service to all cardholders issued a JPay Card upon release.  Those customer services include the issuance of replacement Cards if lost, stolen, or inoperative.  JPay also agreed to ensure that funds would be available to cardholders once activated.

66.     On information and belief, Defendants have engaged in a pattern and practice of freezing accounts for supposed "fraudulent activity," "suspicious activity," and/or identity theft, even though the JPay Cards are not issued with a cardholder's name (and therefore no identity other than the Card number and PIN are attached to the Card), and Defendants do not explain the basis for these assertions.

67.     Once frozen, Defendants deliberately require cardholders to traverse a gauntlet of hurdles to regain access to their account.  With full knowledge that their consumer base is recently released prisoners, Defendants insist that cardholders with

frozen accounts provide proof of their drivers' licenses (which they likely do not have so soon after release, if at all) and proof of payment of a utility bill or cell phone bill in their name (which they likely do not have, as many released prisoners return to society and live in transitional housing and do not have bills in their names) before they can regain access to their personal and state-provided funds.

68.     Defendants deliberately place additional conditions on access to frozen accounts as each condition is met in a conscious attempt to delay a cardholder's access to his or her funds.  The longer the delay, the more maintenance and decline fees Defendants can extract from the account.

69.     Once a cardholder satisfies the growing list of requirements for access, Defendants insist that they cannot grant access to the account, and that the cardholder has to contact the prison to access his balance.

70.     CDCR officials do not have access to a cardholder's account information, and according to Walter Mazza, a CDCR Accounting Administrator II, the agency does not have the right to view that activity under federal law.

71.     With CDCR unable to view any transaction history, any statement otherwise to cardholders like Mr. Reyes who are told to contact CDCR to reactivate a frozen account is inherently deceptive.

72.     As frozen accounts remain active, Defendants continue to extract maintenance and decline fees until such time as the cardholder manages to regain control of the account or the account balance is depleted.

73.     Defendants can charge and collect these exorbitant fees because their exclusive contracts with government entities shield them from competitive market forces and because they have absolute control over the funds once the funds are transferred to them by the government entity.

74.     CDCR extended its original contract with JPay twice.  In July 2017, CDCR and JPay entered into a new contract for services through 2020.

### 2.     Implementation of the JPay Card Program

75.     Before implementing the JPay Card program, CDCR received approval from the California Department of Finance for JPay to operate as the agency's fiscal agent and to operate an account outside of the state treasury for the purpose of funding JPay Cards for releasees.  CDCR deposits funds in this outside account, which JPay then draws down to load funds onto individual Card accounts maintained by Sunrise Bank.

76.     At all times, CDCR retained title to and ownership of that outside account, as administered by JPay and established at Wells Fargo Bank.  JPay, however, pays the account maintenance fees.

77.     CDCR implemented the use of JPay Cards in phases, beginning in October 2014.  All CDCR facilities were using JPay Cards as of May 2015, and they continue to use these Cards to disburse inmate funds to this day.

78.     CDCR facilities still maintain cash reserves, in case there is a lost connection to JPay's servers and a Card cannot be loaded at the time of an inmate's release.

79.     Even with the Card program in place across all CDCR facilities, not all inmates receive a JPay Card; those transferred from CDCR custody to a state hospital or who will be held at a county facility after their release receive their funds via check. Moreover, the initial program did not allow for Cards to carry balances over $2500.  If an inmate had over $2500 in funds ($200 in gate money and $2300 in trust account funds), only $2500 would go on the JPay Card.  The remainder was issued via check.

80.     After JPay learned of additional bank regulations requiring security verifications on prepaid Card balances in excess of $1000, the limit was lowered.

81.     Cards now may be loaded with $800 from an inmate's trust account and $200 in state-provided gate money before the Card requires additional security verifications.  These verifications—such as a social security number or an accurate date of birth—may not be possible for every cardholder, and therefore CDCR issues *all* funds via check if an inmate's trust account balance exceeds $800.   No verification is completed for JPay Cards with balances under $800.

82.     By October 2015, CDCR claimed it had already observed a 50% reduction in accounting work required to operate the JPay Card program versus cash.

83.     As CDCR began implementing the JPay debit release card program, they noted that, in the last six months of 2014, the average amount of trust account funds issued to releasees was $159.89.  Encouraged that the average amount would not be in excess of $1000—which would trigger the additional security verifications—CDCR moved to add gate money to the Cards as well.  Part of their reasoning was to allow for

more funds to be added to the Card as a means to increase the likelihood of cardholders being charged the monthly maintenance fee—that way JPay could "make some money off the deal" with CDCR.

84.     Soon after CDCR began issuing JPay Cards, CDCR employees began learning of complaints and concerns with the program.  For example, for inmates being transferred to other facilities, CDCR decided to cease issuing JPay Cards altogether for transferees because the Cards were incurring maintenance fees while the inmate remained in custody.

85.     The contract between JPay and CDCR allows for a "monthly" maintenance fee after only five days.  But several CDCR employees, upon discovering this provision during the roll-out of the program, objected.  In order to process releases for inmates in more remote detention centers, some Cards are activated at a centralized CDCR location and shipped to the detention center.  Since not all Cards are activated at the time of release, and some days or weeks before, CDCR employees were concerned that some accounts were accruing fees before the releasee took possession of the Card.

86.     In response to this criticism, JPay agreed to charge the initial monthly maintenance fee after 30 days.

87.     CDCR officers also raised concerns about issuing fee-laden JPay Cards to developmentally disabled and learning impaired releasees who would not readily comprehend how to use the Cards or how to avoid the fees.

88.     As early as May 2015, CDCR officers began worrying that the fees, in

particular the monthly maintenance fee, were not clearly disclosed to releasees, and asked that the fees be reprinted on release forms with an affirmative acknowledgement that the releasee would sign, as well as on a separate slip of paper in an inmate's release paperwork.  CDCR ultimately decided that an additional slip of paper clearly outlining the fees would add to officers' workloads, and was never implemented.  No affirmative acknowledgement of the fees was ever added to the inmate release forms.  While CDCR's legal team did approve an additional disclosure of fees generally, that disclosure was never implemented because CDCR was concerned the disclosure did not list all applicable fees.

89.     On information and belief, no changes to the release forms were ever implemented.

90.     By October 2015, CDCR began inquiring about the number of inmates that had been charged the monthly maintenance fee, and how long it usually takes for cardholders to deplete their funds.  When they asked to receive this information bi-annually, JPay refused.  JPay insisted that they did not know, that only Sunrise Bank had that information, and that JPay would not supply it.

91.     CDCR employees also raised concerns that the Cards would not be widely accepted at retailers, as the Cards do not have the cardholder's name (and releasees do not have state ID cards immediately after release, when they will be most in need of their JPay Card funds) and thus cannot present identification at the point of sale.

92.     Without the ability to use the fee-free point-of-sale option at all locations,

then, CDCR hoped that most releasees would use an in-network ATM instead. Out-of-network ATMs are subject to bank fees.

93. CDCR and Parole Unit officers are trained to know that any problems with the Card are to be directed to JPay, and that they should direct releasees to the number on the back of the Card or to the JPay website for assistance.

### 3. CDCR's Property Release Procedures

94. Releasees do not sign anything confirming that they agree to receive their JPay Card, or that they have received or agree to any of its terms.

95. For CDCR's records, released prisoners are to sign a "release fund debit card log," but this log acknowledges that the Card may be given to either the releasee or his parole agent. The log only documents the receipt of "release funds," which includes only state-issued gate money, and not the balance of an inmate trust account.

96. Each releasee also signs a Release Statement that accounts for all property items being returned, including clothing, "personal resources," and gate money payments. When signing this form, releasees are informed whether their property will be disbursed via prepaid debit release card or check:

97.   The release form does not list the fees attendant to the Card or require acknowledgement or agreement to the terms of the Card.

98.   CDCR and Parole Unit officers are trained to obtain a signature before the Card is released; if the releasee refuses to sign, no Card—and thus no funds—will be given.

99.   Releasees have no way of knowing when their Card was activated.  With prisons located across the state, many Cards are activated at a centralized CDCR location before they are shipped to remote detention centers for issuance, with days or

weeks passing before the Cards are ultimately handed to the releasee.

100.   A copy of the terms and conditions, which is not given to releasees, notes that "[b]y activating or using" the Card, the cardholder has agreed to the terms set therein.  But cardholders have no choice in activating the Card—it is activated by CDCR personnel.

101.   Mr. Reyes and the Class are not bound by terms that allow activation by third parties to constitute their acceptance.

102.   When a releasee is given the Card, it is already activated.

103.   An inmate's personal trust account funds are loaded onto the Card, as well as the State of California's statutorily-required gate money.  When JPay extracts fees from releasee's accounts, they not only profit off of their cardholders: they also take public funds for their own gain.  On information and belief, JPay and Sunrise Bank also profit off of their cardholders by earning interchange fees on any cardholder's transactions and by earning interest on releasees' fund accounts.

104.   If the cardholder is returned to custody with the Card on his person and with an active balance, there is no mechanism to extract the balance.  Instead, the Card is treated like personal property and left to languish in a locked box with his other physical possessions—and for JPay to extract maintenance fees for the duration of his incarceration and/or until the entire account is depleted.  This leads to JPay not only taking the inmate's personal funds, but also any gate money on the Card.

105.   Individuals who are released from CDCR facilities do not voluntarily

engage with Defendants, enroll in the program, or take any affirmative steps to form any contractual relationship with JPay, Sunrise Valley Bank, or Praxell. They have no choice but to accept a JPay Card in lieu of receiving the return of their own money in the form of cash or check.  If an inmate refuses to accept an already-activated JPay Card, they simply lose their money as the balance is depleted by imposition of the fees.

**C.    Plaintiff Reyes's Experience**

106.    After serving nearly thirty years in the California corrections system, Mr. Reyes was released on parole from High Desert State Prison in Susanville, California on Monday, January 16, 2017.

107.    Early that morning, at High Desert, a correctional officer first handed him a change of clothes and all his release paperwork.  Mr. Reyes quickly signed his release form without reading it, at which point the officer informed him that he would receive his inmate trust account balance and gate money on a prepaid debit release card.

108.    Mr. Reyes asked the officer to instead receive his funds in cash, but the officer told him that the prison "doesn't do that" and that they only release funds on the Cards.

109.    Before this point, Mr. Reyes was never informed that he would be receiving the remainder of his prison account balance and his state-provided $200 "gate money" on a prepaid debit card.  He presumed that he would receive these funds in cash.

110.    After signing the release form, Mr. Reyes waited approximately two hours

at the High Desert facility before a van arrived to transport him to Reno, Nevada so he could catch a bus to Sacramento.  During those hours, Mr. Reyes read his release paperwork; he saw nothing concerning the JPay Card, its fees, or its terms in his release paperwork.

111.    A correctional officer then accompanied him as he was transported via van from the High Desert facility to the closest major bus depot in Reno, Nevada.

112.    There, the correctional officer waited with Mr. Reyes until shortly before the next Sacramento, California-bound bus departed. Mr. Reyes sat with a single box of his possessions as the correctional officer from High Desert watched over him.

113.    Just before the bus's departure, the correctional officer went to the bus depot window and purchased a bus ticket to from Reno to Sacramento for Mr. Reyes. The officer did not inform Mr. Reyes that he would be buying the ticket for him before he did so.  The officer used the prison-issued JPay Card to purchase the ticket.

114.    Needing Mr. Reyes' signature to complete the transaction, the officer beckoned for Mr. Reyes to join him at the window and sign the transaction receipt.  It was then that Mr. Reyes was told he would be boarding a bus to Sacramento, where he would need to change to a bus or train to get to Los Angeles, where his family lives.

115.    As the Sacramento-bound bus prepared to leave the depot, the officer handed Mr. Reyes his JPay Card in a plain, white sleeve.  Mr. Reyes does not believe there was any writing on the sleeve.

116.    Mr. Reyes discarded the sleeve shortly after the officer handed him the

JPay Card.

117.   The officer did not provide Mr. Reyes with any other written materials concerning the Card.  The only additional information the correctional officer provided Mr. Reyes about the JPay Card was to tell him that the last four digits of his California Department of Corrections number was also his PIN for the Card.

118.   After receiving the Card, Mr. Reyes boarded his Sacramento-bound bus.

119.   He did not receive any terms and conditions for the Card.

120.   Mr. Reyes did not elect to receive his funds on the JPay Card, and if given the choice, he would have preferred to receive his gate money and the balance of his inmate account in cash.

121.   Mr. Reyes never applied for the JPay Card.

122.   Mr. Reyes never agreed to receive the JPay Card, instead of the balance of his inmate trust account and his gate money in cash, and never assented to the terms to any contract with Defendants.

123.   Mr. Reyes had no choice but to accept the already activated—and already used—JPay Card.  He could not meaningfully object to receiving the prepaid debit release card; if he refused the Card, he would be unable to use any of his trust account or gate money funds.  His receipt of the balance of his inmate trust account and his gate money in the form of the JPay Card was completely and utterly involuntary.

124.   The Card was initially loaded with $424.20: $200 in state-issued "gate money" and another $224.20 in remaining funds from his commissary account.

125.   Once Mr. Reyes arrived in Sacramento, he went to the depot cashier window and used the Card to purchase a train ticket to Hanford, California, where he would meet his family.

126.   He then went to an ATM in the Sacramento bus depot, hoping to extract the Card's balance in cash.  The transaction was declined, and after trying once more, he gave up.

127.   Mr. Reyes then left the station to find an open store nearby so he could buy something to eat.  At that point, he had not eaten or had a drink of water in over 12 hours.

128.   As it was a holiday, very few stores were open.  He went into a nearby bail bondsman's shop, and asked where he could buy something to eat.  The bondsman then offered him a club sandwich, bottle of water, and cup of coffee.

129.   Mr. Reyes then returned to the station, where he realized that he had missed his train.  He used the Card to pay a $15-20 rebooking fee and book a seat on the next Hanford-bound train.

130.   Mr. Reyes then returned to the bail bondsman's shop, where he asked where he could purchase a prepaid cell phone.  One of the bondsman's employees escorted him to a nearby Metro PCS store, where Mr. Reyes spent approximately $60 on a cell phone and pre-loaded minutes, and then went to Subway to purchase a sandwich for the train ride to Hanford.

131.   Once in Hanford, Mr. Reyes met his family and spent one night in town.

He then used the JPay Card to purchase a bus ticket to Los Angeles.

132.    Much of the JPay Card's balance was depleted in the first few days after his release.  The bus and train tickets from Reno to Sacramento and then from Sacramento to his home in Los Angeles used most of the balance.  Mr. Reyes also used the Card to purchase food and a cell phone within the first few days of receiving the Card.

133.    Because Mr. Reyes' family gave him additional cash and a cell phone attached to his sister's cellular plan when they reunited in Hanford, he did not use the Card immediately upon his arrival in Los Angeles.  He waited several days before attempting to use the Card again.

134.    After spending approximately $320 during his trip home, Mr. Reyes attempted to make a purchase at a retail store using the JPay Card in Los Angeles.  His transaction was declined.

135.    After the sales clerk tried again without success to run the JPay Card, Mr. Reyes paid for his items in cash instead.

136.    He then attempted to use the JPay Card at an ATM in nearby 7-11 store.  Again, his JPay Card was declined.  He also tried to use the Card at the 7-11 counter to purchase a hot dog.  The Card was declined once more.

137.    Later that evening, Mr. Reyes then called customer support hotline listed on the back of his JPay Card.  The hotline service is operated by Praxell.

138.    He was told by a Praxell representative that his account had been frozen

due to "suspicious activity."

139.   When Mr. Reyes asked for an explanation as what triggered their concerns, the Praxell representative told him that, as a third-party service provider, they could not answer his questions as to why the account was frozen and could only offer advice on how to regain access to the account.

140.   The Praxell customer support representative told Mr. Reyes that he would need to provide a photocopy of the Card itself and a copy of his driver's license to unfreeze the account.

141.   Because Mr. Reyes had been released from prison less than a week before, he told the customer support representative that he did not yet have a driver's license. The representative again reiterated that his account would not be reinstated until he provided a copy of the JPay Card and a valid driver's license.

142.   Mr. Reyes asked how a copy of his driver's license would confirm that the Card's usage was not fraudulent.  The representative refused to answer, and again insisted that he needed to provide copies of the Card and his license.

143.   No representative explained how his drivers' license would confirm identity for a Card that did not have his—or any other—name on it.

144.    Mr. Reyes obtained a California driver's license in mid-February 2017.

145.   Shortly after obtaining his driver's license, Mr. Reyes again called the Praxell-operated customer support number to ask for access to his account.  A Praxell representative told him to send copies of his Card and driver's license via email, and

provided an email address for him to use.  The email account had a "praxell.com" address.

146.  Mr. Reyes received no response to this this email.

147.  A few days later, Mr. Reyes called the Praxell-operated customer service number again.  He explained that he had emailed the requested documentation, and requested access to his account.

148.  This time, the Praxell customer support representative told him that he would need to provide a copy of a utility bill in his name, as well as the previously requested driver's license and JPay Card copies.

149.  No representative explained how a utility bill with his name on it would confirm his identity for the JPay Card that did not have his—or any other—name on it.

150.  After explaining that he did not have any utilities in his name as he was living in transitional housing and did not directly pay for his utilities, the customer support representative said Mr. Reyes could instead provide a copy of his cell phone bill.

151.  No representative explained how a cell phone bill with his name on it would confirm his identity for the JPay Card that did not have his—or any other—name on it.

152.  Because Mr. Reyes' sister pays for his cell phone through her family plan, he could not provide a cell phone bill to satisfy Praxell customer support's requirement.

153.  The Praxell customer service representative then told Mr. Reyes that he

could get a signed and notarized letter from his landlord attesting to Mr. Reyes' residence.

154.   No representative explained how a letter attesting to his residency would confirm his identity for the JPay Card that did not have his—or any other—name on it.

155.   On May 30, 2017, after Mr. Reyes obtained a signed, notarized letter from his landlord, he again called the Praxell-operated customer support line and asked how he could regain access to his JPay Card account and receive an accounting of his Card balance.  He was told to email copies of the letter, his Card, and his driver's license to a provided email address.

156.   That same day, Mr. Reyes emailed the requested documents to the provided address.

157.   On May 31, 2017, a representative from the Praxell-operated JPay Card Support responded, and told Mr. Reyes that he would "need to contact the facility which released you concerning your JPay Card."

158.   No representative explained how High Desert Prison, whose officials would have no access to any information about his JPay Card, could reactivate his account.

159.   Not understanding how High Desert Prison would have any way to reactivate the JPay Card, Mr. Reyes grew increasingly frustrated.

160.   Shortly after this email exchange, Mr. Reyes spoke with the Warden of High Desert Prison.  Due to Mr. Reyes' work on behalf of the Inmate Advisory

Council, his continued work to improve the prison's conditions from outside its walls, and his involvement with the Anti-Recidivism Coalition, he speaks with the Warden frequently.

161.   Mr. Reyes mentioned his problems regaining access to his JPay Card account, and that he had been told to contact the prison to reinstate his account.

162.   The Warden insisted that the prison had nothing to do with the JPay Cards after an inmate's release, and that JPay handles everything regarding the Cards and that prison officials could not reinstate the account.

163.   Left without options and with the Praxell-run JPay Card support team insisting he needed to turn to the prison for help, even though he knew the prison could not grant him access to his account, Mr. Reyes gave up.

164.   With his account still frozen, Mr. Reyes had access to neither his remaining JPay Card balance nor an accounting of his transactions and fees.

165.   At the time of this filing, Mr. Reyes has been denied access to his remaining JPay balance since the end of January 2017—for over 11 months.

166.   At the time his account was frozen, it is his understanding that he had approximately $80 remaining on the JPay Card.  This is an approximation because he has been unable to access his Card balance for the reasons described above.

167.   It is Mr. Reyes' understanding that he has been charged a monthly maintenance fee every month since his JPay Card was activated, as his account was frozen before he could deplete his balance.   Depending on when his JPay Card was

activated, he believes Defendants have charged him either $33 or $36 in monthly maintenance fees.

168.    It is his understanding that he was also charged a $1.00 decline fee each time he tried to use his JPay Card after JPay froze his account.

169.    Each of these monthly maintenance fees and several of the decline fees were imposed after Mr. Reyes returned home to this District.

170.    Each attempt to regain access to his account was made while Mr. Reyes resided in this District.

171.    On January 8, 2018, Mr. Reyes again called the Praxell-operated JPay support number.  After providing his Card number, an automated system told him that his account had been closed.  He does not know when, between May 31, 2017 and January 8, 2018, Defendants closed his account.

172.    No customer service representative will reinstate his account, or provide him with his exact account balance.

## V.    CLASS ALLEGATIONS

173.    Defendants have engaged in the same conduct with respect to thousands of released inmates across the United States.

174.    Plaintiff Reyes brings this action on behalf of himself, and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following nationwide Class: all persons who, upon release from a jail, prison, or detention facility, were provided with an inmate release Card issued by JPay, or its

affiliates, and/or Sunrise Bank or its affiliates, and paid a fee in conjunction with the use or maintenance of the Card. ("National Class").

175.  Additionally, Plaintiff Reyes seeks to represent the following California Subclass: all persons who, upon release from a jail, prison, or detention facility in the State of California, were provided with an inmate release Card issued by JPay, or its affiliates, and/or Sunrise Bank or its affiliates, and paid a fee in conjunction with the use or maintenance of the Card. ("California Subclass"). The National Class and the California Subclass are collectively referred to herein as the "Class."

176.  Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

177.  The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are geographically dispersed throughout the United States. While the exact number of Class members is in the sole possession, custody and control of Defendants, Plaintiff believes that there are well in excess of 100 members.

178.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Questions of law and fact common to the Class include but are not limited to:

A.      Whether the JPay Cards that the Class received carried unlawful fees;

B.      Whether Defendants JPay and Sunrise Bank profited from receipt of

interchange fees and interest on JPay Cards issued to the Class;

C.      Whether Defendants deprived Plaintiff and the Class of a right, privilege, or immunity protected by the Constitution or the laws of the United States;

D.      Whether Defendants JPay and Sunrise Bank violated the Electronic Fund Transfer Act, 15 U.S.C. 1693, *et seq.*;

E.      Whether Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce and thus violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

F.      Whether Defendants converted money belonging to the Class by taking unlawful fees;

G.      Whether Defendants engaged in an unlawful trespass to chattels;

H.      Whether and what form(s) of relief should be afforded to the Class; and

I.      Whether the Class has suffered damages as a result of Defendants' actions, and, if so, the measure and amount of such damages, including any statutory and punitive damages.

179.   Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent.  Defendants' practices have targeted and affected all members of the Class in a similar manner, i.e., they have all sustained damages arising out of Defendants' practices.

180.   Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in both complex class action and

consumer fraud litigation.  Plaintiff has no interests which are adverse to, or in conflict with the interests of the other members of the Class.

181.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

182.  The interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.   The damages suffered by the individual Class members may be relatively small.   Therefore, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. Plaintiff anticipates no difficulty in management of this action as a class action.

183.  The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# VI.   FIRST CAUSE OF ACTION

## (Claim Pursuant to 42 U.S.C. § 1983 for Violation to the Fifth Amendment)
## (Against Defendants JPay and Sunrise Bank)

184.  Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

185.  The Takings Clause of the Fifth Amendment to the United States Constitution states in relevant part that "private property [shall not] be taken for public use, without just compensation."

186.  The Takings Clause is applicable to the states through the Fourteenth Amendment.

187.  Defendants engaged in state action under color of law, in that Plaintiff's and the Class's unconstitutional deprivation of their property resulted from a governmental policy.  Defendants are persons for whom the State is responsible in that: (a) CDCR, and other governmental entities that issue Defendants' prepaid debit release Cards, bore an affirmative obligation upon release of Plaintiff and the Class to return monies confiscated from them; (b) the State delegated that traditional public function to Defendants and gave to Defendants Plaintiff's confiscated money; (c) the State negotiated for the exact services and fee schedules attached to each JPay Card, and are thus rules of conduct imposed by the State on Defendants and/or indicia that the State is responsible for Defendants' conduct; and (d) Defendants voluntarily assumed the State's obligation by contract.  Defendants thereby deprived Plaintiff and the Class of a right,

privilege, or immunity protected by the Constitution or the laws of the United States.

188.  The State benefited from the actions of its delegee, as Defendants' business practices allow the State to administer a "cashless" inmate property release system and save the costs associated with its own management of the inmate property release system, as well as minimize opportunities for correctional officers to steal from the inmate property return funds.

189.  The State negotiated its delegation contract with Defendants, and knowingly assented to Defendants' fee structure as a means to transfer its costs onto Plaintiff and the Class.

190.  Plaintiff and the Class possessed a constitutionally protected interest in the monies Defendants took from them.

191.  Defendants' Card fees and the interest earned thereon should be declared to constitute a taking of property in violation of the Fifth Amendment of the United States Constitution.

192.  Defendants should be ordered to compensate Plaintiff and the Class for the taking of property.

193.  Plaintiff and the Class are entitled to their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b) (2000).

# VII.   SECOND CAUSE OF ACTION

## (Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.*)
## (Against Defendants JPay and Sunrise Bank)

194.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

195.   The primary objective of the Electronic Fund Transfer Act ("EFTA") is to protect consumer rights by providing a basic framework establishing the rights, liabilities, and responsibilities of participants in the electronic fund and remittance transfer systems.

196.   Defendants JPay and/or Sunrise Bank are financial institutions as defined by 15 U.S.C. § 1693a(9), and 12 C.F.R. §1005.2(a)(2)(i) (2013), because they directly or indirectly hold accounts belonging to consumers and/or they issue an access device to consumers.

197.   Defendants' JPay Cards are accounts pursuant to 15 U.S.C. §1693a(2) and 12 C.F.R. §1005.3 (2013).

198.   Plaintiff and the Class are natural persons, and thus consumers as defined by 15 U.S.C. § 1693a(6).

199.   Plaintiff and the Class are entitled to release funds or "gate money," which is a government benefit conferred upon releasees from state prison systems.

200.   In order to receive this government benefit, Plaintiff and the Class have no choice but to accept their gate money on Defendants' JPay Card.  They are given no alternative means to receive these benefits.

201.   Because Defendants require Plaintiff and the Class to "establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of … receipt of a government benefit," Defendants violate 15 U.S.C. § 1693k(2).

202.   Defendants JPay's and/or Sunrise Bank's violations of the EFTA have caused and continue to cause Plaintiff and the Class damages.

203.   Plaintiff and the Class are entitled to their actual and statutory damages, as well as reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1693m(a)(3).

## VIII.  THIRD CAUSE OF ACTION

### (Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.*)
### (Against Defendants JPay and Sunrise Bank)

204.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

205.   The primary objective of the Electronic Fund Transfer Act ("EFTA") is to protect consumer rights by providing a basic framework establishing the rights, liabilities, and responsibilities of participants in the electronic fund and remittance transfer systems.

206.   Defendants JPay and/or Sunrise Bank are financial institutions as defined by 15 U.S.C. § 1693a(9), and 12 C.F.R. §1005.2(a)(2)(i), because they directly or indirectly hold accounts belonging to consumers and/or they issue an access device to consumers.

207.   Defendants' JPay Cards are accounts pursuant to 15 U.S.C. §1693a(2) and 12 C.F.R. §1005.3.

208.   Plaintiffs are natural persons, and thus consumers as defined by 15 U.S.C. § 1693a(6).

209.   Defendants' JPay Cards are general-use prepaid cards pursuant to 15 U.S.C. § 1693l-1(2), and 12 C.F.R. §1005.20, because they are issued to consumers for personal, family, or household purposes and are redeemable at multiple, unaffiliated merchants.

210.   Defendants market their prepaid debit release Cards to the general public by promoting the JPay Cards on their website.

211.   Defendants' JPay Card is distributed generally to any consumer whose cash has been confiscated by CDCR (or by any other governmental entities that have contracted with Defendants for prepaid debit release Cards).

212.   Defendants violated 15 U.S.C. § 1693l-1 by imposing dormancy, inactivity and/or service fees—including weekly maintenance fees, transaction fees, and ATM fees—on the general-use prepaid Cards of Plaintiff and members of the Class without satisfying 15 U.S.C. § 1693l-1(b)(2).

213.   Among its consumer protection provisions, the EFTA also prohibits the unsolicited issuance to a consumer of an electronic fund transfer Card that does not meet all of the EFTA's unsolicited access device criteria.  *See* 15 U.S.C. § 1693i.

214.   Defendants JPay and/or Sunrise Bank violated 15 U.S.C. § 1693i by issuing to consumers already-validated, unsolicited electronic transfer Cards that do not meet all of the EFTA's unsolicited access device criteria.

215.   Defendants JPay's and/or Sunrise Bank's violations of the EFTA have caused and continue to cause Plaintiff and the Class damages.

216.   Plaintiff and the Class are entitled to their actual and statutory damages, as well as reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1693m(a)(3).

## IX.   FOURTH CAUSE OF ACTION

### (California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)
### (Against All Defendants)

217.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

218.   Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

219.   California's Unfair Competition Law ("UCL") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's UCL is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice.  Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of the UCL.

220.   Defendants engage in substantial sales and marketing of its financial products and services within the State of California.  By contracting to provide JPay Cards within the entire CDCR system, they acquired the exclusive monopoly to provide their Cards to every inmate released within the California prison system.

221.   Defendants' acts and practices, as described herein, constitute unlawful,

fraudulent, or unfair business practices, in that (1) their practices violate the United States Constitution and federal statutes as described in this Complaint; (2) the justification for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiffs and the Class members; and (3) Defendants' conduct is immoral, unethical, oppressive, unconscionable, and/or substantially injurious to Plaintiffs and Class members.

222.   Defendants' unfair business acts and practices, as described above, include, but are not limited to: exploiting their position of power to benefit and profit of off some of our most vulnerable as they reenter society; wrongfully opening accounts without customer authorization and without the privity of contract; starting services without customer approval or authorization; and using customers' personal and state-issued money in illegitimate accounts to pay for fees, costs, and other penalties related to accounts that Defendants' opened without the consent, knowledge, or authorization of Plaintiffs and Class members.

223.   Defendants' actions are also unlawful because, *inter alia*, they violate the Fifth Amendment to the United States Constitution and the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*

224.   Plaintiffs and Class members have been damaged by these practices.

225.   Plaintiff and the Class lost their personal funds and state-conferred benefits as a result of Defendants' unlawful and unfair conduct.  These losses amount to the fees deducted from their inmate trust account funds and state-issued gate money that were

deposited with Defendants for disbursement upon their release, as well as any interest earned on their JPay/Sunrise Bank accounts.

226.   Plaintiff requests that this Court enter such orders or judgments as necessary to enjoin Defendants from continuing their unlawful and unfair practices and to restore to Plaintiff and the other Class Members all monies Defendants acquired through such conduct, pursuant to Cal. Bus. & Prof. Code § 17203.

## X.   FIFTH CAUSE OF ACTION

### (Conversion)
### (Against Defendants JPay and Sunrise Bank)

227.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

228.  CDCR, and other correctional facilities that issue Defendants' JPay Cards have taken money from Plaintiff and other members of the Class to hold during their incarceration, acting in the capacity of their representative.  Upon their release, CDCR and other correctional facilities were obligated to return the full amount of their money to them.  Any purported agreement to use the JPay Card to return that money, less fees charged by the Defendants, lacks consideration and is unenforceable.

229.  Conversion occurs when one wrongfully exercises dominion over the property of another.  Money may be the subject of conversion if the Defendants wrongfully received it.

230.  Defendants, exercising their control over the funds in the JPay Card

accounts, have wrongfully collected fees from Plaintiff and members of the Class, and have taken specific and readily identifiable funds from Plaintiff and the members of the Class in payment of these fees.

231.  Defendants, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the Class, without legal justification.

232.  Defendants continue to retain these funds unlawfully and without the consent of Plaintiff or the Class.

233.  Defendants' unlawful acts of conversion have caused actual damages in the amounts of the unauthorized fees converted by Defendants, plus interest.  Defendants actions were also oppressive and malicious, such that Plaintiff and the Class Members are entitled to an award of punitive damages.

## XI.   SIXTH CAUSE OF ACTION

### (Trespass to Chattels)
### (Against All Defendants)

234.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

235.  Defendants intentionally interfered with the possession of the personal property of Plaintiff and the Class when they deprived them immediate, unencumbered of access to their personal and government-provided funds.

236.  Defendants intentionally interfered with the possession of the personal

property of Plaintiff and the Class when they froze JPay accounts for supposed "fraudulent activity," "suspicious activity," or "identity theft," knowing that no such activity had occurred.

237.   Defendants then imposed increasingly cumbersome requirements on Plaintiff and members of the Class who sought access to his or her froze account.  These requirements were unnecessary, deliberately delayed access to the account, impaired Plaintiff's ability to use his personal and state-issued funds, and were wholly unrelated to the protection of Plaintiffs' account from supposed fraudulent or suspicious activity or identity theft.

238.   Defendants' unlawful acts of trespass have caused actual damages in the amounts of the unauthorized fees converted by Defendants, plus interest.  Defendants actions were also oppressive and malicious, such that Plaintiff and the Class Members are entitled to an award of punitive damages.

## XII.   SEVENTH CAUSE OF ACTION

### (Accounting)
### (Against All Defendants)

239.   Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

240.   Because Defendants maintain financial accounts on behalf of Plaintiff's and the Class's personal and state-issued funds, Defendants have a fiduciary relationship with Plaintiff and the Class and/or because Defendants possesses money

belonging to Plaintiff and the Class that Defendants are obliged to surrender.

241.  By virtue of Defendants' relationship with Plaintiff and Class and/or their obligation to surrender funds belonging to Plaintiff and the Class, Defendants must account for all fees and debits from accounts for the Plaintiffs and the Class.

242.  Plaintiff and the Class therefore request an accounting of their balances, to include a catalog of all fees charged and all transactions processed, associated with their JPay accounts.

## XIII.  DEMAND FOR JURY TRIAL

Plaintiff respectfully requests jury trial of all claims that can be so tried.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class, prays for the following relief:

1.     An order certifying this case as a class action and appointing Plaintiff and the undersigned counsel to represent the Class;

2.     Declaration, judgment, and decree that Defendants JPay, Sunrise Bank, and/or Praxell's conduct alleged herein:

a.  Violates the Fifth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment;

b.  Violates the Electronic Fund Transfer Act (as to Defendants JPay and Sunrise Bank only);

c.  Violates the California Unfair Competition Law;

d.  Constitutes conversion; and

e.  Constitutes trespass to chattels.

3.      Damages to Plaintiff and the Class to the maximum extent allowed under state and federal law; including, but not limited to, ordering Defendants to pay actual, statutory, and punitive damages;

4.      Costs and disbursements of the action;

5.      Restitution and/or disgorgement of ill-gotten gains and unjust enrichment, including both any interchange fees and/or interest earned;

6.      Pre- and post-judgment interest; and

7.      Reasonable attorneys' fees;

8.      An injunction requiring corrective measures to be taken to prevent Defendants from engaging in the above-described misconduct; and

9.      Such other relief, in law and equity, as this Court may deem just and proper.

DATED this 12th day of January, 2018.

**KELLER ROHRBACK L.L.P**.


By */s/ Lisa Faye Petak*
    Lisa Faye Petak (CA Bar No. 300914)
    lpetak@kellerrohrback.com
    **KELLER ROHRBACK L.L.P**
    801 Garden Street, Suite 301
    Santa Barbara, CA  93101
    Phone: (805) 456-1496
    Fax (805) 456-1497

**KELLER ROHRBACK L.L.P**.
Mark A. Griffin (*Pro Hac Vice Pending*)
mgriffin@kellerrohrback.com
Laura R. Gerber (*Pro Hac Vice Pending*)
lgerber@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Phone: (206) 623-1900
Fax (206) 623-3384

**THE HUMAN RIGHTS DEFENSE CENTER**
Sabarish Neelakanta (*Pro Hac Vice Pending*)
sneelakanta@humanrightsdefensecenter.org
Daniel Marshall (*Pro Hac Vice Pending*)
dmarshall@humanrightsdefensecenter.org
Masimba Mutamba (*Pro Hac Vice Pending*)
mmutamba@humanrightsdefensecenter.org
P.O. Box 1151
Lake Worth, FL 33460
Phone: (561) 360-2523
Fax: (866) 228-1681

*Attorneys for Plaintiff Joe Rudy Reyes and the Class*