Lisa Faye Petak (CA 300914)
lpetak@kellerrohrback.com
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA  93101
Phone (805) 456-1496, Fax (805) 456-1497

Mark A. Griffin (WSBA 16296)
mgriffin@kellerrohrback.com
Laura R. Gerber (WSBA 34981)
lgerber@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 623-1900, Fax (206) 623-3384

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOE RUDY REYES, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>   v.<br><br>JPAY, INC.; SUNRISE BANKS NATIONAL ASSOCIATION; AND PRAXELL INC.,<br><br>                    Defendants. | No. 2:18-cv-00315-R-MRW<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION OF ALL CLAIMS**<br><br>The Honorable Manuel L. Real<br><br>Date:    May 7, 2018<br>Time:   10:00 a.m.<br>Place:  Courtroom 880, 8th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................1

II.    FACTUAL HISTORY ..........................................................................5

III.   LEGAL STANDARD ..........................................................................8

IV.    ARGUMENT.......................................................................................9

    A.     The Arbitration Clause Lacked Mutual Assent................................10

        1.     Defendants Never Communicated Their Offer to Arbitrate. ...............................................................................11

        2.     Even Assuming Defendants' Offer to Arbitrate was Valid, Reyes Did Not Accept It. ..............................................15

            a.     Reyes Was Unaware of Defendants' Offer. .................15

            b.     Reyes Did Not Know How to Accept Defendants' Offer.....................................................................17

            c.     "Repeated Use" is Not a Means of Acceptance. ..........19

            d.     Acceptance Under Undue Influence is Not Acceptance................................................................19

    B.     A Delegation Clause Does Not Strip this Court of its Duty to Inquire Whether Any Contract was Formed. ....................................22

        1.     No Agreement to Delegate Arbitrability was Formed............22

        2.     Defendants' Delegation Clause is Not Clear and Unmistakable. ..............................................................24

V.     CONCLUSION........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adkins v. Sogliuzzo*,
   No. CIV.A. 09-1123 SDW, 2010 WL 502980 (D.N.J. Feb. 9, 2010) ................. 22

*Ashworth v. Five Guys Operations, LLC*,
   No. CV 3:16-06646, 2016 WL 7422679 (S.D.W. Va. Dec. 22, 2016) ............... 25

*AT&T Tech., Inc. v. Commc'n Workers of Am.*,
   475 U.S. 643 (1986) ................................................................................ 24

*In re Baroni*,
   No. AP 13-01069, 2015 WL 6956664 (B.A.P. 9th Cir. Nov. 10, 2015) ............. 13

*Benedict v. State Farm Bank, FSB*,
   309 Ga. App. 133 (2011) ....................................................................... 17

*Brennan v. Opus Bank*,
   796 F.3d 1125 (9th Cir. 2015) ............................................................... 22

*Brodke v. Alphatec Spine Inc.*,
   160 Cal. App. 4th 1569 (2008) ............................................................. 10

*Brown v. Stored Value Cards, Inc.*,
   No. 3:15-CV-01370-MO, 2016 WL 755625 (D. Or. Feb. 25, 2016) ... 4, 13, 14, 19

*Buckeye Check Cashing, Inc., v. Cardegna*,
   546 U.S. 440 (2006) ............................................................................. 11

*De Salles v. Cook*,
   No. CV16-1111 DMGPJWX, 2016 WL 9113995 (C.D. Cal. May 12, 2016) ....... 1

*Discover Bank v. Poling*,
   No. 04AP-1117, 2005 WL 737404 (Ohio Ct. App. Mar. 31, 2005) ................... 17

*Discover Bank v. Ray*,
   138 Wash. App. 1002 (2007) ................................................................. 17

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ......................................................................... 9, 24

*Ford v. Midland Funding, LLC*,
   264 F. Supp. 3d 849 (E.D. Mich. 2017) ................................................. 17

*Garcia v. Biter*,
    195 F. Supp. 3d 1131 (E.D. Cal. 2016) ................................................................ 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010)............................................................................ 9, 23, 24, 25

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002)....................................................................................... 22

*Ingalls v. Spotify USA, Inc.*,
    No. C16-03533 WHA, 2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) .............. 24

*Knutson v. Sirius XM Radio Inc.*,
    771 F.3d 559 (9th Cir. 2014) ...........................................................*passim*

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
    845 F.3d 979 (9th Cir. 2017) ....................................................................... 9

*Lee v. Intelius Inc.*,
    737 F.3d 1254 (9th Cir. 2013) ............................................................... 3, 11

*In re Marriage of Starr*,
    189 Cal. App. 4th 277 (2010) ..................................................................... 20

*McLellan v. Fitbit, Inc.*,
    No. 3:16-CV-00036-JD, 2017 WL 4551484 (N.D. Cal. Oct. 11, 2017) ............. 23

*Miranda v. Arizona*,
    384 U.S. 436 (1966)..................................................................................... 21

*Momot v. Mastro*,
    652 F.3d 982 (9th Cir. 2011) ..................................................................... 23

*Oliver v. First Century Bank, , N.A.*,
    No. 17-cv-620-MMA (KSC), 2017 WL 5495092 (S.D. Cal. Nov. 16, 2017), ... 23, 24

*Pope v. EZ Card & Kiosk LLC*,
    No. 15-61046-CIV, 2015 WL 5308852 (S.D. Fla. Sept. 11, 2015) ..................... 4

*Prima Paint Corp., v. Flood Conklin Mfg. Co.*,
    388 U.S. 395 (1967)..................................................................................... 11

*Regan v. Stored Value Cards, Inc.*,
   85 F. Supp. 3d 1357 (N.D. Ga. 2015), aff'd sub nom, 608 F. App'x 895 (11th Cir. 2015) ............................................................................................ 3, 4

*Rent-A-Ctr. W., Inc., v. Jackson*,
   561 U.S. 63 (2010) ................................................................ 22, 23, 24

*Rosenthal v. Great W. Fin. Sec. Corp.*,
   14 Cal. 4th 394 (1996) .................................................................. 10

*Sanford v. Member Works, Inc.*,
   483 F.3d 956 (9th Cir. 2007) ........................................................... 8

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) ...................................................... 9, 16

*Stinger v. Chase Bank, USA, NA*,
   265 F. App'x 224 (5th Cir. 2008) ..................................................... 17

*Texaco, Inc. v. Goldstein*,
   229 N.Y.S. 2d 51 (N.Y. Mun. Ct. 1962) ............................................. 17

*Trans–Tec Asia v. M/V Harmony Container*,
   518 F.3d 1120 (9th Cir. 2008) ......................................................... 9

*United States v. Lopez*,
   762 F.3d 852 (9th Cir. 2014) .......................................................... 13

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
   489 U.S. 468 (1989) .................................................................. 10

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
   25 Cal. App. 3d 987 (Ct. App. 1972) .................................................. 12

**Statutes**

Cal. Civ. Code § 1550 ................................................................... 11

Cal. Civ. Code § 1558 ..................................................................... 3

Cal. Civ. Code § 1565 ............................................................ 14, 15, 17, 18

Cal. Civ. Code § 1575 .................................................................. 20, 21

Cal. Civ. Code § 1580 ................................................................... 11

Cal. Civ. Code § 1584 ........................................................................ 11, 12

Cal. Civ. Code § 1810 .............................................................................. 17

Electronic Fund Transfer Act, 15 U.S.C. § 1693 (2010), *et seq.* ........................ *passim*

Federal Arbitration Act, 9 U.S.C. § 2 ........................................................ 10

Federal Arbitration Act, 9 U.S.C. § 4 .......................................................... 9

**Other Authorities**

Fed. R. Civ. P. 12 ................................................................................... 1

Fed. R. Civ. P. 12(b) ............................................................................... 1

Fed. R. Evid. 602 .................................................................................. 13

Martin F. Horn, *Corrections in the 21st Century*, PRISON AND JAIL ADMINISTRATION: PRACTICE AND THEORY 526 (Peter M. Carlson & Judith Simon Garrett eds., 2nd ed. 2008) ........................................................................ 21

RESTATEMENT (FIRST) OF CONTRACTS § 512 .............................................. 20

RESTATEMENT (SECOND) OF CONTRACTS § 19(1)-(2) .................................. 12, 15

RESTATEMENT (SECOND) OF CONTRACTS § 58 ............................................ 17

Plaintiff Joe Rudy Reyes opposes Defendants JPay, Inc. ("JPay") and Praxell Inc.'s ("Praxell") Motion to Compel Arbitration of All Claims, ECF No. 43, and Sunrise Bank National Association's ("Sunrise Bank") (together, "Defendants") joinder of that Motion, ECF No. 44. The Court should deny the motion for the reasons set forth herein.[1]

## I.    INTRODUCTION

Imagine: At an airport security checkpoint, a traveler places his wallet with $25 cash on the security scanner. Moments later, after passing through the metal detectors, he does not get his wallet or his money back—instead, a security officer tells him he will receive a debit card loaded with the $25. He is told that if he refuses the card, he relinquishes his money altogether and will not be able to purchase an airport tram ticket so he can reach his gate. Before the traveler ever receives the card, however, the security officer swipes the card at a kiosk, and then hands the traveler both the ticket and the debit card. The traveler receives no written terms with the card. Later, he is told that by "using" the card, he "formed" a contract with an unknown third party to arbitrate any claims.

While this disturbing scenario is not reality, it is virtually indistinguishable from the events of January 16, 2017. Upon his release from the California Department of Corrections and Rehabilitation ("CDCR") facility, High Desert Prison, Plaintiff Reyes

---

[1] Defendants assert that motions to compel arbitration are responsive pleadings under Federal Rule of Civil Procedure 12. Mtn. 1 n.1. Ninth Circuit law is not settled on this point. *See De Salles v. Cook*, No. CV16-1111 DMGPJWX, 2016 WL 9113995, at *4 (C.D. Cal. May 12, 2016) ("While Rule 12(b) does not expressly contemplate motions to compel arbitration, courts generally treat such motions as preliminary motions rather than responsive pleadings.") (compiling cases). Thus, Reyes does not concede the point.

was handed an unsolicited, pre-activated debit card in lieu of cash for the balance of his

inmate trust account and his state-issued "gate money."[2] Like hundreds of released

prisoners issued one of these cards by CDCR, Reyes did not accept the card consensually.

The card is forced on released prisoners, and they are presented with a Hobson's choice

to either accept a card that unlawfully conditions the receipt of their funds on an electronic

fund transfer, or forfeit their cash. The cards also purport to bind recipients to mandatory

arbitration provisions even though they: (1) never requested the cards; (2) were unaware

of the offer to arbitrate; and (3) never accepted the purported offer.

Plaintiff Reyes' prepaid debit card was issued by Sunrise Bank and serviced by

JPay and Praxell (hereinafter, "Card"). He had no idea that by taking the Card the CDCR

officer handed him, he would not only have to accept his gate money via an electronic

fund transfer, but also be deprived of his day in court. Reyes did not want the Card; he

specifically asked for his cash to be returned. Declaration of Joe Rudy Reyes ("Reyes

Decl.") ¶ 4. He did not receive any paperwork when the Card was handed to him, and he

certainly did not agree to arbitrate any disputes with Defendants when the Card was

foisted upon him just as he was reentering society after nearly thirty years in CDCR's

custody. *Id.* ¶¶ 6, 14-15, 17. Nor did Reyes know that, after a CDCR officer first used the

Card to purchase a bus ticket for him, he would forever be bound by Defendants' terms

---

[2] As alleged in the Complaint, ¶¶ 194-216, ECF No. 1, the issuance of these unsolicited, prepaid debits cards violates the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 (2010), *et seq.* ("EFTA").

or that his subsequent use of the Card would be used as evidence of his "acceptance" of an offer to arbitrate. Reyes used the Card with one goal: accessing his money. He did not know—and could not have known—that the fact that he had a balance in his inmate trust account at the time of his release and then using the Card to buy food and transportation home could contractually bind him to the Defendants that took his cash. *Id.* ¶ 21.

Yet Defendants now ask the Court to force Reyes to arbitrate his case even though no arbitration agreement, or contract of any kind, was formed.[3] Reyes is not the first released prisoner or arrestee to sue after receiving a prepaid debit card, and other courts faced with similar fact patterns have denied motions to compel arbitration because the prisoner's lack of choice did not constitute mutual assent—which is essential to the formation of any contract. In *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357 (N.D. Ga. 2015), aff'd sub nom, 608 F. App'x 895 (11th Cir. 2015), the plaintiff received a debit card upon release from jail, and the district court denied the defendant's motion to compel arbitration even though the plaintiff had received the contract terms with his card. The court held that because he was in "*a condition of absence of liberty of choice*

---

[3] Nowhere in the "Cardholder Agreement" are JPay and Praxell listed as parties to the supposed "agreement" to arbitrate—only Sunrise Bank is named. *See* Declaration of Moshe Golombe ("Golombe Decl."), ECF No. 43-6, Ex. 15. While Defendants may claim that a "tri-party agreement" appoints Praxell and JPay as Sunrise Bank's agents, Mtn. 12 & n.11, no released prisoner knows of this "tri-party agreement" or Defendants' business relationship, and thus they cannot agree to arbitrate with the unnamed entities. *See* Cal. Civ. Code 1558 ("It is essential to the validity of a contract, not only that the parties should exist, but that it should be possible to identify them."); *see also Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) (affirming denial of motion to compel arbitration where it was unclear as to which entities were party to the agreement).

1  which *Defendant reasonably could have anticipated*," *id.* at 1364, and could not

2  voluntarily accept the card or its terms, no enforceable agreement existed, *id.* at 1365.

3  Similarly, in *Brown v. Stored Value Cards, Inc.*, No. 3:15-CV-01370-MO, 2016 WL

4  755625 (D. Or. Feb. 25, 2016), the plaintiff did not receive the paperwork explaining the

5  terms associated with the debit card and was unaware of the arbitration clause. *Id.* at *1.

6  The court denied defendants' motion to compel arbitration because the plaintiff could not

7  have known about the terms and, even though she used the card, her usage was not a

8  meaningful choice because she was forced to interact with defendants if she wanted to

9  access her cash. *Id.* at *4. In contrast, in *Pope v. EZ Card & Kiosk LLC*, No. 15-61046-

10  CIV, 2015 WL 5308852, at *3 (S.D. Fla. Sept. 11, 2015), the court compelled arbitration

11  for a dispute arising from a pre-detention-center-issued debit card where the prisoner *was*

12  *offered a choice to receive a check or the card*, and he affirmatively chose the card.[4]

13  Defendants' practices here are substantially similar to those at issue in *Regan* and

14  *Brown* so there is no arbitration agreement to enforce. Lacking support for their position,

15  Defendants cite to inapplicable case law arising out of contracts between willing parties

16  and argue that Reyes' subsequent "usage" of the debit card (after an unauthorized first

17  purchase by a CDCR officer) constitutes an "agreement" to its terms.[5] But all contracts—

---

[4] Such procedures, *i.e.* offering a choice, also likely comply with EFTA.

[5] Reyes never received this putative contract. Declarant Moshe Golombe attaches a copy of the "Cardholder Agreement" Defendants contend applies here. "Golombe Decl., Ex. 15. Reyes does not concede the applicability of this document but, for the purposes of this motion only, accepts the filed copy of the "Cardholder Agreement" as representative

including those to arbitrate—must have mutual assent, and Defendants' "contract" to arbitrate is unenforceable under California law. Defendants' motion must be denied.

## II.    FACTUAL HISTORY

After serving nearly thirty years in the California Department of Corrections and Rehabilitation, Reyes was released from High Desert Prison in Susanville, California on Monday, January 16, 2017. Compl. ¶¶ 1-3, ECF No. 1; Reyes Decl. ¶ 2. In the early hours of January 16, a correctional officer first handed Reyes a change of clothes and his release paperwork. Reyes Decl. ¶ 3. He was told to sign a form for his release, and then an officer verbally told him, for the first time, that he would not receive the balance of his inmate trust account and his state-issued gate money in cash. *Id.* ¶¶ 3, 5. Reyes then asked the officer for his funds in cash, and the officer responded by saying that the prison "doesn't do that" and explaining that the prison would only release his funds on a prepaid card. *Id.* ¶ 4. The "Release Statement" form he signed (Exhibit 3 to the Declaration of Robert Carter, ECF No. 43-1), lists only the balance of Reyes' inmate trust account and the amount of gate money he was to receive: a total of $424.20. The form does not state that these funds will be issued on a prepaid debit card. *Id.* Reyes was not given any written materials explaining this debit card or its terms. Reyes Decl. ¶ 6. The Release Statement did not ask Reyes to confirm that the CDCR officer obeyed internal protocols, explained the terms associated with the card, or provided Reyes with written materials explaining

_____

of the one CDCR officers should have handed him upon his release.  In fact, Reyes did not receive it.  Reyes Decl. ¶ 6.

the card. *Cf.* Carter Decl., Ex. 3. Reyes was not handed a green flyer. Reyes Decl. ¶ 15.

After signing the Release Statement, Reyes waited approximately two hours for a van to transport him to Reno, Nevada, where he would then take a bus to Sacramento, California. *Id.* ¶ 6. During these two hours, Reyes reviewed all his release paperwork, none of which explained the debit card or its terms. *Id.* An officer then drove Reyes to Reno, and waited with him in the station until shortly before the next Sacramento-bound bus was scheduled to depart. *Id.* ¶¶ 7-8. Minutes before the bus left the station, the officer went to the bus ticketing window. *Id.* ¶ 9. The officer did not tell Reyes that he would be purchasing a ticket for him, and Reyes did not authorize such a purchase. *Id.* With Reyes still some distance away, the officer presented a JPay Progress Card ("JPay Card," or "Card") to the ticketing agent and purchased a ticket to Sacramento for Reyes. *Id.* Needing Reyes' signature to complete the transaction, the officer then ordered Reyes to join him at the window and sign the transaction receipt. *Id.* ¶ 11.

Just before boarding the bus, the CDCR officer handed Reyes his JPay Card. *Id.* ¶ 12. The Card was not in a standard-sized white envelope, but rather a small, white sleeve. *Id.* The sleeve did not bear any writing, and no written materials accompanied the Card. *Id.* ¶¶ 12, 14-15. Reyes immediately discarded the white sleeve. *Id.* ¶ 13. After arriving in Sacramento, Reyes used the JPay Card—the only funds he had—to purchase a train ticket to Hanford, California, a prepaid cell phone, and a sandwich for the road. *Id.* ¶¶ 31, 35, 36, 83. After arriving in Hanford and spending one night with his family, he used the JPay Card to purchase a bus ticket to Los Angeles. *Id.* ¶ 37. Once in Los Angeles and

after spending approximately $350 of the Card's balance of $424.20, Reyes attempted several other transactions—but they were all declined. *Id.* ¶¶ 40-43. Reyes called the number listed on the back of the JPay Card for assistance, and he was told by a Praxell customer service representative that his account had been frozen due to "suspicious activity." *Id.* ¶ 44-45. The Praxell customer service representative did not explain what "suspicious activity" triggered their concerns, or relay Defendants' belief that another released prisoner had potentially gained access to Reyes' Card. *See id.* ¶¶ 46, 70-71.

Reyes then spent many months trying to regain access to his money before filing this lawsuit. *See id.* ¶¶ 44-70. Each time he called the Praxell customer service number, he was asked to provide a different, additional form of documentation to prove his identity, including: 1) a copy of his JPay Card, *id.* ¶ 47; 2) a copy of his drivers' license, *id.*; 3) either a recent utility bill in his name, *id.* ¶ 55, a cell phone bill in his name, *id.* ¶ 57, or a signed, notarized letter from his landlord attesting to his residency, *id.* ¶ 60. Even after satisfying each new demand, *id.* ¶¶ 51, 63, Reyes was never granted access to his account history or his money. Instead, on May 31, 2017, a Praxell representative told Reyes he would need to contact High Desert Prison to regain access to his account—even though a High Desert official denied any involvement with the JPay Card program. *Id.* ¶¶ 64, 67-69. Left without options or his money, Reyes filed this lawsuit. *Id.* ¶ 70.

Shortly before filing his complaint, on January 8, 2018, Reyes again called the Praxell customer support number—but after entering his card number, he was told that his account had been closed. *Id.* ¶ 77. It was not until Reyes reviewed Exhibit 16 to the

Golombe Declaration (card transaction history),[6] that he learned that Defendants froze his account on January 20, 2017, and that he had $71.19 remaining on his JPay Card. Reyes Decl. ¶ 80. The transaction history also indicates that his Card was "unloaded" on March 12, 2018—two months after the filing of his complaint. *Id.* ¶ 78.

Reyes did not request or apply for the JPay Card. *Id.* ¶ 20. He never agreed to receive the Card. *Id.* ¶ 23. He did not sign any document agreeing to the Card and/or its terms. *Id.* ¶ 24. He was not given the opportunity to reject the Card, or even to affirmatively accept it. *Id.* ¶¶ 22-23, 25. Yet Defendants now contend that the "Cardholder Agreement" Reyes *did not receive* included an arbitration and delegation provision they now seek to enforce. Golombe Decl., Ex. 15. But Reyes did not know of the terms when he received the Card after the officer had used it, or at any time after he used the Card, and he did not agree to the terms. Reyes Decl. ¶¶ 23, 28.

### III.   LEGAL STANDARD

It is "axiomatic that '[a]rbitration is a matter of contract and a party cannot be required to submit any dispute which he has not agreed so to submit.'" *Sanford v. Member Works, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) (quoting *AT&T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986)). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of

---

[6] As Reyes never had access to his transaction history, he does not concede the accuracy of this document but, for the purposes of this motion only, assumes it is correct.

the specific arbitration clause that a party seeks to have the court enforce ... [T]hese issues always include whether the clause was agreed to." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). Where state law principles call into question the making of the arbitration agreement, "*the court* shall proceed summarily to the trial thereof." Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (emphasis added); *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts."); *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983-84 (9th Cir. 2017) (where a contract does not exist or formation of a contract as a whole is invalid, arbitration agreements are not enforceable). Defendants do not dispute that California law governs the contractual provisions at issue here, *see* Mtn. 14. Thus, the Court should apply California law to the disputes regarding arbitrability and contract formation.[7]

## IV.   ARGUMENT

Defendants' misguided effort to send Reyes' claims, along with any gateway issues of arbitrability, to arbitration fails for the simple reason that Reyes and Defendants never

---

[7] Defendants also seek to enforce the choice-of-law provision in the "Cardholder Agreement," which would apply Minnesota law to issues of enforceability. Mtn. 14. However, the choice-of-law provision cannot be applied here because Reyes disputes there is any contract to enforce. *Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (same).

agreed to arbitrate any dispute. The arbitration and delegation clauses in Defendants' "Cardholder Agreement" fail under basic contract principles because Defendants never presented Reyes with an offer to arbitrate, and even if they did, he did not manifest acceptance—it was a CDCR officer, not Reyes, who first used the Card. Defendants have therefore failed to show that an enforceable contract exists.

**A.     The Arbitration Clause Lacked Mutual Assent.**

Defendants bear the burden of proving the existence of a contract to arbitrate. *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996); *Brodke v. Alphatec Spine Inc.,* 160 Cal. App. 4th 1569, 1574 (2008). Defendants must prove that a valid, enforceable contract to arbitrate exists, and Defendants' desire to make their "Cardholder Agreement" enforceable does not make it so—especially where the "Cardholder Agreement" does not even identify JPay and Praxell as parties. *See supra* note 3.

When Defendants took Reyes' trust account funds and his state-issued benefits and converted them into an unsolicited, pre-activated debit card, they did so without (1) offering their services or the associated terms of the Card; (2) engaging in any negotiation of the arbitration or delegation terms; or (3) providing a meaningful opportunity for Reyes to reject their offer to arbitrate disputes. Because no arbitration agreement can supersede the fundamental rules of contract formation, Reyes did not agree to arbitrate. 9 U.S.C. § 2; *see Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration under the FAA is a matter of consent, not coercion.").

Reyes never received a clear, unambiguous offer to arbitrate the disputes, including

any threshold dispute as to arbitrability, and he never took any action to objectively manifest his assent to that nonexistent offer. In fact, it was a *CDCR officer* who used the Card, not Reyes. Reyes Decl. ¶ 9. Without these basic building blocks, Defendants' claimed agreement to arbitrate fails.[8] Cal. Civ. Code § 1550 (West) ("It is essential to the existence of a contract that there should be: 1) Parties capable of contracting; 2) Their consent; 3) A lawful object; and, 4) A sufficient cause or consideration."); *See also Lee*, 737 F.3d at 1259 (holding that plaintiff did not enter into contract for service, which "also necessarily entails a holding that [he] did not enter into a contract to arbitrate.").

## 1.    Defendants Never Communicated Their Offer to Arbitrate.

All contracts start with mutual assent to a communicated offer. Cal. Civ. Code §§ 1565, 1580 (West 2018). No offeree can be "obligated to act where there was no effective

---

[8] The arbitration provision suffers from the same mutual assent deficiencies as the contract as a whole. Defendants' "Cardholder Agreement" is structured as a unilateral contract that is only accepted upon Reyes' performance of a specified action. Cal. Civ. Code § 1584. The Agreement states that "[b]y activating or using the … Card, … you agree to the terms of this Agreement." Golombe Decl., Ex. 15. There is no separate mechanism of acceptance specific to the arbitration agreement listed in the "Cardholder Agreement." Therefore, without an offer and Reyes' clear, objective assent, there is no agreement to arbitrate any dispute. Unless we are to assume that all arbitration agreements are automatically supported by mutual assent and that all challenges to deficient contract formation are foreclosed for arbitration clauses, the lack of mutual assent of the agreement as a whole likewise applies to the arbitration provisions. To hold otherwise would contravene Supreme Court precedent which holds that arbitration agreements are to be placed on equal footing with all other contracts. *See Buckeye Check Cashing, Inc., v. Cardegna*, 546 U.S. 440, 443 (2006) (citing 9 U.S.C. § 2); *Prima Paint Corp., v. Flood Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract.").

notice that action was required." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014); *see Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Ct. App. 1972) (if offeree does not know of an offer, his conduct cannot manifest assent). Because Defendants neither extended an offer to arbitrate nor told Reyes that his conduct would constitute acceptance, Reyes Decl. ¶¶ 21-24, 26, he cannot be forced to arbitrate.

To counter this defect, Defendants argue that Reyes impliedly assented to the "Cardholder Agreement" and the arbitration clause when he used the Card. Mtn. 15-17. In other words, Defendants contend that they offered Reyes a unilateral contract—a contract accepted by performance of a specific act, rather than a promise to perform. Cal. Civ. Code § 1584 (West 2018). But to be enforceable, Defendants' offer must have been clearly communicated; Reyes must have been adequately notified of the contract's terms and how to manifest acceptance; and he must have taken actions to indicate assent. RESTATEMENT (SECOND) OF CONTRACTS § 19(1)-(2) (AM. LAW INST. 1981); *See also id.* at § 19 cmt. c ("even though the intentional conduct of a party creates an appearance of assent…, he is not responsible for that appearance unless he knows … that his conduct may cause the other party to understand that he assents."). Defendants insist that Reyes received the "Cardholder Agreement" because they ship release cards and "Cardholder Agreements" to their contracting prisons. Declaration of Atinuke Sode ¶ 6, ECF No. 43-4. That the jails are given "Cardholder Agreements" (effectively, Defendants' offers) does not mean that those offers were indeed extended—and not a single declaration offered by Defendants says otherwise. These self-serving declarations are not evidence

that Reyes did, in fact, receive the "Cardholder Agreement" because no declarant has personal knowledge that CDCR provided the "Cardholder Agreement" to Reyes.[9] *See* Fed. R. Evid. 602; *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014) ("Personal knowledge means knowledge produced by the direct involvement of the senses."); *see also In re Baroni*, No. AP 13-01069, 2015 WL 6956664, at *10 (B.A.P. 9th Cir. Nov. 10, 2015) (striking declaration where declarant had no personal knowledge to support his testimony). The lack of evidence that Reyes received the offer creates a material dispute that must be submitted to a jury. *See Brown,* 2016 WL 755625, at *1 (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co*., 925 F.2d 1136, 1142 (9th Cir. 1991)).

Declarant Teresa Stalter can testify only to High Desert Prison's standard protocol, and she cannot say that she personally ensured that Defendants' "Cardholder Agreement" reached Reyes. *See* Declaration of Teresa Stalter, ECF No. 43-3. Similarly, Robert Carter declares only that he picked up Reyes' JPay Card from the High Desert Prison Receiving and Release Department on January 13, 2017 and that he, *or another officer*, later gave Reyes his JPay Card. Declaration of Robert Carter Decl. ¶ 6, ECF No. 43-1. Yet Carter also states that only two officers were on duty to process and transport Reyes on the day he was released—and he was not one of them. *Id.* ¶ 10. Therefore, Carter could not have been the officer to hand Reyes his JPay Card, and his signature on the control log—dated

---

[9] To the extent Defendants have additional evidence, it would be inappropriate for it to be introduced on reply. *See Garcia v. Biter*, 195 F. Supp. 3d 1131, 1134 (E.D. Cal. 2016) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond)).

the day after Reyes' release—only shows that someone else was responsible for Reyes' JPay Card. Further, neither of the officers who *were* on duty that day remember him. Officer Hearn does not know if he was the one who processed Reyes' release. Declaration of David Hearn ¶ 3, ECF No. 43-2. Nor does Officer Hawks. Declaration of Jason Hawks ¶ 3, ECF No. 43-5. Defendants' declarations, then, are nothing more than recitations of protocol, *not* evidence that protocol was followed on January 16, 2017.

Here, Reyes declares that he did not receive the "Cardholder Agreement," or any supporting materials informing him how he could opt out of arbitration: this is direct evidence that Reyes never received Defendants' offer to arbitrate. Reyes Decl. ¶¶ 21-24, 26, 28; *Brown*, 2016 WL 755625, at *2 (rejecting declaration attesting to "policy" of handing out terms with debit release cards, and denying defendants' arbitration motion). Nor was Reyes under any obligation to seek out these terms. *See Brown*, 2016 WL 755625, at *2 (where a plaintiff does not apply for the card, he is not "charged with knowledge and acceptance of the terms that he could have read in the exercise of ordinary care.") (quoting and distinguishing *Baker v. Am. Express Travel Related Servs. Co.*, No. CIV.A. 02-26-JBC, 2002 WL 1205065, at *2 (W.D. Ky. May 28, 2002)); *see also Knutson*, 771 F.3d at 566 (offeree not bound by "contractual provisions of which he was unaware."). Reyes lacked any awareness of a contractual relationship with Defendants, as he did not engage with them and never received the "Cardholder Agreement" or ancillary materials. Reyes Decl. ¶¶ 21-24, 26-28. In sum, Defendants never communicated their offer, and thus no agreement was formed. Cal. Civ. Code § 1565.

### 2.   Even Assuming Defendants' Offer to Arbitrate was Valid, Reyes Did Not Accept It.

No offer, no matter how clear, can form a contract without mutual acceptance. Cal. Civ. Code § 1565. Even assuming *arguendo* that Defendants' offer was valid, Reyes never accepted it, and thus, no agreement to arbitrate their disputes was formed.

### a.   Reyes Was Unaware of Defendants' Offer.

Defendants ignore that conduct cannot constitute acceptance if the offeree does not know an offer was made. In *Knutson*, the Ninth Circuit (applying California contract law) held that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." 771 F.3d at 566; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 19(1)-(2) (AM. LAW INST. 1981). The court upheld plaintiff's challenge to an arbitration provision with Sirius XM Radio where the "contract" was buried in the "Welcome Kit" provided with a new vehicle purchase. "A reasonable person in Knutson's position could not be expected to understand that purchasing a vehicle from Toyota would simultaneously bind him or her to any contract with Sirius XM, let alone one that contained an arbitration provision without any notice of such terms." *Knutson,* 771 F. 3d at 559 (citing *Com. Factors Corp. v. Kurtzman Bros.*, 131 Cal. App. 2d 133, 136 (1955) ("[N]either expressly or impliedly, . . . did the parties ever discuss arbitration or bargain about it, and certainly they reached no agreement thereon.")). Yet even if a plaintiff engages with a party seeking to arbitrate, if the offer was not clearly an offer, no

conduct can manifest acceptance. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 128-29 (2d Cir. 2012) (applying California law). In *Schnabel*, the court held that allowing a company to auto-debit a credit card is too passive, by itself, to manifest assent. *Id.* at 128. Instead, courts must look to "whether a reasonably prudent offeree would be on notice" that continuing payments would amount to acceptance of contract terms, especially where the consumer is unaware of the contract offer in the first place. *Id.* at 120, 128-29. *Knutson* and *Schnabel* counsel the same result here. After decades in state custody, Reyes was released early in the morning on January 16, 2017. Reyes Decl. ¶¶ 2-3. Like other prisoners getting released, he was nervous, and eager to complete the release process and escape the prison's confines. *Id.* ¶ 3. As in *Schnabel*, he did not receive the arbitration terms, and his use of the Card is too passive to manifest assent.[10] He was not on notice that his use of a pre-activated Card (that he did not request and was the only means of accessing his trust account and gate money) could manifest his acceptance of arbitration terms. He was certainly not aware that he was engaging with private parties when retrieving his cash. Reyes Decl. ¶ 21. He had no reason to believe that he had waived his right to a jury trial because he did not know, or have reason to know, that Defendants had made him an offer. Reyes' use of the Card, then, is insufficient to show assent.[11]

---

[10] Though Reyes did not first use the Card—a CDCR officer did, and Reyes did not authorize its use, Reyes Decl. ¶ 9—his later Card usage is too passive to manifest assent.

[11] Defendants' cases regarding *conscious use of solicited credit cards by cardholder*s are inapposite. *See* Mtn. 16-17 & n.15. Each case concerns a consumer relationship where the plaintiffs: 1) sought out the services or product; 2) knew they were accepting an offer for those services or products; and 3) were the ones who first used the product or

### b.     Reyes Did Not Know How to Accept Defendants' Offer.

Even if Reyes had received Defendants' "Cardholder Agreement," the ambiguity of Defendants' "offer" leaves released prisoners guessing as to what, exactly, they need to do to accept it. If an offer is unclear, an offeree cannot manifest his acceptance. *See Knutson*, 771 F.3d at 566 (offer not "clearly and effectively communicated"); RESTATEMENT (SECOND) OF CONTRACTS § 58 (AM. LAW INST. 1981) (acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered). The mechanism for manifesting acceptance to the "Cardholder Agreement" is buried four paragraphs into the fine print of the document and, by its terms, can occur *before a released prisoner even receives the Card*:

> Agreement to Terms. By **activating or using** the enclosed Card (see "Activating Your Card" below), you agree to the terms of this Agreement. If you do not agree to the terms of this Agreement or do not want to use the Card, please destroy the Card at once by cutting it in half and call us at 866-777-5729 to cancel your Card account.

service. *See Ford v. Midland Funding, LLC*, 264 F. Supp. 3d 849, 851, 859 (E.D. Mich. 2017) (genuine issue of material fact as to existence of agreement when plaintiff requested the credit card but debt was sold to third party); *Benedict v. State Farm Bank, FSB*, 309 Ga. App. 133, 134 (2011) (arbitration proper where plaintiff applied for and used credit card); *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 225 (5th Cir. 2008) (same); *Discover Bank v. Ray*, 138 Wash. App. 1002 (2007) (contract enforceable where plaintiff applied for and used credit card); *Discover Bank v. Poling*, No. 04AP-1117, 2005 WL 737404, *1 (Ohio Ct. App. Mar. 31, 2005) (affirming judgment in favor of card issuer where debtor had no evidence that he did not apply for and use the credit card); *Texaco, Inc. v. Goldstein*, 229 N.Y.S. 2d 51, 52 (N.Y. Mun. Ct. 1962) (debtor liable for debts because he applied for and used the card). In contrast, Reyes did not apply for the JPay Card; did not know of the Card's terms; and *he did not use the Card in the first instance*. Nor can Defendants rely on California Civil Code § 1810, which outlines the requirements of installment contracts, because no contract—installment or otherwise—is enforceable without mutual assent. *See* Cal. Civ. Code § 1565.

Golombe Decl., Ex. 15 (emphasis added).[12] But the Cards are activated days *before* released prisoners receive the Card. *See* Compl. ¶¶ 63, 85, 99; *see also* Carter Decl., Ex. 2 (Control Log noting that Reyes' Card was activated on January 13, 2017—three days before he received it). If "activation" is all that is necessary to be bound by the terms, Reyes did not objectively manifest his assent because he did not activate the Card—a CDCR officer did. Nor can "use" of the Card bind Reyes to the terms of the "Cardholder Agreement," because Reyes did not first use the Card. *See* Reyes Decl. ¶ 9. *The only people who "accepted" the terms of the JPay Card were CDCR employees, not Reyes.*

Furthermore, the third sentence of the paragraph purports to give released prisoners a means to reject the Card, but it says nothing about how one retrieves their money after destroying the Card. More confusing, Defendants changed the terms of the "Cardholder Agreement" to allow released prisoners the right to request a check within seven days of the Cards' activation in the period between the printing of High Desert Prison's stock of JPay "Cardholder Agreements" and Reyes' release. But this cures nothing, as Reyes cannot be on notice of uncommunicated terms.[13] *See* Cal. Civ. Code § 1565.

---

[12] The Card itself does not list how someone is to accept the terms associated with the Card, Reyes Decl., Ex. A, so the only way Reyes would know that "activation" or "use" of the Card could deny him the right to a jury trial is if he had received the "Cardholder Agreement," which he did not. *See supra* IV(A)(1).

[13] Furthermore, even if Reyes had received a "Cardholder Agreement" with these terms, his potential failure to request a check within seven days of receipt of the Card cannot imply consent. No released prisoner can know when their Card was activated; in Reyes' case, his Card was activated three days *before* he received it. *See* Carter Decl., Ex. 2. If he had tried to request a check five days after his release, that request would have been

### c.   "Repeated Use" is Not a Means of Acceptance.

Knowing Reyes did not activate or initially use the Card, Defendants instead ignore the language of the Agreement and insist that it was Reyes' *repeated use* of the Card that indicated his acceptance of the Card's terms. Mtn. 8-10, 13, 16. But nothing in the "Cardholder Agreement" says that repeated use is necessary—or hints at how much use is enough—to manifest acceptance. Even if Reyes had received the "Cardholder Agreement" and knew some action could signal his acceptance, this purported "repeated use" method is not mentioned in the document. Reyes would have no way of knowing each use of the Card would further strengthen Defendants' supposed Agreement—nor would he know how many uses are "enough" to sufficiently manifest his acceptance. That Defendants now rely on this uncommunicated "repeated use" requirement is a bald-faced attempt to sidestep the undisputed fact that it was a CDCR officer, and not Reyes, who "accepted" the JPay Card. Reyes Decl. ¶ 9. Moreover, any "choice" to use the Card is not a choice at all. As the district court found in *Brown*, because the plaintiff "*had* to take the card and *had* to work through the Defendants' system in order to get her money back," and any fee-free options required her to engage with the defendant's company, the choice to use the debit card was not a meaningful one. 2016 WL 755625, at *4.

### d.   Acceptance Under Undue Influence is Not Acceptance.

---

outside the seven day window and he would have "accepted" the Card's terms. Other released prisoners would have had no opportunity to reject the Card and request a check, as some cards are activated days or weeks in advance. *See* Compl. ¶¶ 63, 85, 99.

Finally, even if Reyes' use of the Card could manifest acceptance, that acceptance is voidable because he only agreed to the terms of the "Cardholder Agreement" under undue influence: Defendants held his personal property, and the only way he could access his money was to agree to Defendants' terms. This is not a meaningful choice, and no agreement premised on Defendants' coercive tactics is enforceable. Undue influence consists of using confidence or authority to gain an unfair advantage over another, "taking an unfair advantage of another's weakness of mind," or "taking a grossly oppressive and unfair advantage of another's necessities or distress," Cal. Civ. Code § 1575, and is a contract defense. *In re Marriage of Starr*, 189 Cal. App. 4th 277, 284 (2010).

Here, Defendants held Reyes' cash, and his only means for retrieving the sorely-needed funds upon reentry was to use the Card (and, as Defendants argue, likewise agreeing to arbitrate any disputes, including disputes over arbitrability). When a CDCR officer presented Reyes with the Card after the CDCR officer had used it, Reyes had no choice but to accept it—unless he wanted to relinquish his trust account balance and government benefits.[14] Reyes Decl. ¶¶ 22, 25. Defendants had already loaded Reyes' money onto their pre-activated debit card *without his consent*, and he had no means of

---

[14] Two of Reyes' claims are under EFTA, which prohibits the conditioning of the receipt of government benefits on electronic fund transfers, such as debit cards. *See* 15 U.S.C. § 1693k(2) (2011). Also under EFTA, debit cards cannot be unsolicited and pre-activated, *id.* § 1693i, and acceptance of such a card cannot create a binding contract. *See* RESTATEMENT (FIRST) OF CONTRACTS § 512 (AM. LAW INST. 1932) ("A bargain is illegal within the meaning of the Restatement of this Subject if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy.").

purchasing food, water, or travel without using the Card; this is the definition of someone "taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575. Reyes did not simply make a business deal under less-than-advantageous terms; rather, Defendants controlled his money and the only means he had to access his own government benefits, purchase food and water, and buy a bus and train ticket to get home was to use the Card.[15] Reyes would never have interacted with Defendants or used the Card and thereby "agreed" to Defendants' terms if he had any other choice. Moreover, Reyes was handed his Card by a correctional officer just as he was leaving custody for the first time in nearly thirty years; even if he had been given a choice to accept Defendants' arbitration terms, that choice would have been illusory because "[a] prison or jail is, by its very nature, inherently coercive."[16] And Reyes did not think he could refuse the Card—after all, the officer handing him the Card was also his jailor and told him he could not get his cash back.[17] Because Reyes' use of the Card—

---

[15]Again, even if Reyes had received the "Cardholder Agreement," nothing in the Agreement listed any other means of retrieving his funds other than use of the Card.

[16] Martin F. Horn, *Corrections in the 21st Century*, PRISON AND JAIL ADMINISTRATION: PRACTICE AND THEORY 526 (Peter M. Carlson & Judith Simon Garrett eds., 2nd ed. 2008); *see also, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 457-58 (1966) (because "custodial surroundings" are inherently coercive, due process requires warnings before arrestees can waive their Fifth Amendment rights).

[17] The declaration of John L. Clark, former Assistant Director of the Federal Bureau of Prisons, confirms the coercive circumstances facing prisoners when issued debit cards. "[T]he prisoner or detainee is in a powerless, dependent position in relationship to staff. Every aspect of their life is under the control and direction of the correctional or police authorities."  Clark Decl. ¶ 31, Declaration of Mark A. Griffin, Ex. A.

and thus his purported assent to arbitration—was obtained under undue influence, the "Cardholder Agreement" is unenforceable. *See Adkins v. Sogliuzzo*, No. CIV.A. 09-1123 SDW, 2010 WL 502980, at *9 (D.N.J. Feb. 9, 2010) (undue influence defense as to a contract as a whole is for the court to decide and denying motion to compel arbitration).

**B.    A Delegation Clause Does Not Strip this Court of its Duty to Inquire Whether Any Contract was Formed.**

While the FAA reflects a liberal policy in favor of arbitration, "there is an exception to this policy: The question whether the parties have submitted a dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Comm'ns Workers*, 475 U.S. 643, 649 (1986)). Courts must ask three questions before assigning arbitration clause challenges to an arbitrator: (1) whether the arbitration clause contains a delegation clause; (2) if so, whether the delegation is "clear and unmistakable;" and (3) where clear and unmistakable delegation is found, whether the delegation clause itself is enforceable under general principles of contract law. *Rent-A-Ctr. W., Inc., v. Jackson*, 561 U.S. 63, 68 (2010); *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015).

**1.    No Agreement to Delegate Arbitrability was Formed.**

Defendants argue that a company can force prisoners to arbitrate disputes—regardless of whether the prisoner has a valid contract for goods or services—by simply dropping a "delegation clause" in the fine print. *See* Mtn. 19-21. But the delegation clause

suffers from the same infirmities as the arbitration provision; it is likewise unenforceable.

Reyes disputes that he entered into any agreement *at all* with Defendants, including the delegation agreement—not the "validity" of the agreement, as Defendants suggest. *See* Mtn. 19-20. His dispute belongs squarely before the Court. *Granite Rock*, 561 U.S. at 297, 299-300; *Rent-A-Ctr.*, 561 U.S. at 78. Defendants cite inapposite case law where litigants did not challenge the existence of a contract to arbitrate certain issues, but rather the validity of the contract as a whole. But enforcement of arbitration or delegation provisions in cases where all parties to the agreement agreed to transact with one another are inapplicable to the case at bar. Defendants cite *Momot v. Mastro*, 652 F.3d 982, 984, 988 (9th Cir. 2011), for the proposition that parties agree to arbitrate the question of arbitrability when they agree to arbitrate the validity of any part of an arbitration clause. Mtn. 20. However, in *Momot*, the Ninth Circuit held that the parties had clearly and unmistakably agreed to delegate issues of arbitrability because the parties had freely negotiated and entered into a contract. Similarly, in *McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2017 WL 4551484, at *2-3 (N.D. Cal. Oct. 11, 2017), the delegation clause was enforced because the plaintiffs accepted the terms and conditions associated with their purchase before their fitness device could be operational. In contrast, Reyes did not negotiate with Defendants, seek out their services, or receive the purported contract, and as such his case is not one for the arbitrator. *See Granite Rock*, 561 U.S. at 299 (arbitration/delegation clause inapplicable where contract formation in dispute).

Defendants' reliance on *Oliver v. First Century Bank*, N.A., No. 17-cv-620-MMA

(KSC), 2017 WL 5495092 (S.D. Cal. Nov. 16, 2017), is likewise misplaced. In *Oliver*, the plaintiff did not challenge the delegation clause in his opposition to a motion to compel arbitration. *See id.* at *1. Yet unlike *Oliver*, Reyes states outright that, without an offer and acceptance, he did not agree to arbitrate issues of arbitrability. *Cf. id.*[18]

### 2.    Defendants' Delegation Clause is Not Clear and Unmistakable.

Only where each party's intent to delegate is clear and unmistakable may a court delegate questions of arbitrability to the arbitrator. *AT&T Techs., Inc.*, 475 U.S. at 649. Courts are to apply a "reverse presumption" in favor of a judicial—rather than arbitral—forum for questions of arbitrability. *First Options*, 514 U.S. at 945. *Any ambiguity* must be treated as support for the conclusion that the court, not an arbitrator, should decide arbitrability. *Id.* Defendants have the burden of proving that the delegation clause is "clear and unmistakable." *Ingalls v. Spotify USA, Inc.*, No. C16-03533 WHA, 2016 WL 6679561, at *3-4 (N.D. Cal. Nov. 14, 2016). Defendants have failed to meet their burden.

Defendants' only evidence of the clarity and unmistakability of the delegation clause is the fine print of an agreement Reyes *never received.* But even if Reyes *had* received the "Cardholder Agreement" before receiving the Card, the fact that Defendants prey on prisoners who cannot read the "Cardholder Agreement" before the Card is

---

[18] To the extent the *Oliver* court assumed that only challenges to the enforceability of the delegation provision itself—and not also questions of contract formation—belong in court, its reasoning was flawed. It is well settled that arbitration and delegation clauses are not enforceable where the party disputes the formation of the contract itself. *See Granite Rock*, 561 U.S. at 299; *Rent-A-Ctr.*, 561 U.S. at 78.

activated and foisted upon them belies a deliberate attempt to obscure the delegation clause. Individuals receiving the Cards are being discharged from incarceration, when their only desire is to leave confinement. *See* Reyes Decl. ¶ 3. While Defendants' intention for an arbitrator to adjudicate gateway issues may be clear, that intent

> is obfuscated, possibly intentionally, for the [prisoner] unless the [prisoner] happens to know the [American Arbitration Association] rules, a ridiculous assumption, or takes the time to read the rules and specifically notices, among all the other rules, the rule permitting the arbitrator to determine gateway issues. How this could be considered clear and unmistakable can only be explained if the true meanings of "clear" and "unmistakable" are ignored.

*Ashworth v. Five Guys Operations, LLC*, No. CV 3:16-06646, 2016 WL 7422679, at *3 (S.D.W. Va. Dec. 22, 2016). Reyes did not have any opportunity to read, review, or challenge any provision in Defendants' "Cardholder Agreement," including the delegation clause. He could not and did not manifest his intent to delegate, and thus his disputes cannot be sent to arbitration. *Granite Rock*, 561 U.S. at 297, 299-300.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Compel Arbitration. Should the Court grant the Motion, Plaintiff requests that the Court dismiss, not stay, the action. *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014) ("a district court may either stay the action or dismiss it outright when … the court determines that all of the claims raised in the action are subject to arbitration.").

DATED this 16th day of April, 2018.

**KELLER ROHRBACK L.L.P**.


By *s/Lisa Faye Petak*
    Lisa Faye Petak (CA 300914)
    lpetak@kellerrohrback.com
    801 Garden Street, Suite 301
    Santa Barbara, CA  93101
    Phone: (805) 456-1496
    Fax (805) 456-1497

**KELLER ROHRBACK L.L.P**.
Mark A. Griffin (*Pro Hac Vice*)
mgriffin@kellerrohrback.com
Laura R. Gerber (*Pro Hac Vice*)
lgerber@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Phone: (206) 623-1900
Fax (206) 623-3384

**THE HUMAN RIGHTS DEFENSE CENTER**
Sabarish Neelakanta (*Pro Hac Vice Pending)*
sneelakanta@humanrightsdefensecenter.org
Daniel Marshall (*Pro Hac Vice Pending*)
dmarshall@humanrightsdefensecenter.org
Masimba Mutamba (*Pro Hac Vice Pending*)
mmutamba@humanrightsdefensecenter.org
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Facsimile: (866) 228-1681

*Attorneys for Plaintiff*