Lisa Faye Petak (CA 300914)
lpetak@kellerrohrback.com
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA  93101
Phone (805) 456-1496, Fax (805) 456-1497

Mark A. Griffin (WSBA 16296)
mgriffin@kellerrohrback.com
Laura R. Gerber (WSBA 34981)
lgerber@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 623-1900, Fax (206) 623-3384

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JOE RUDY REYES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JPAY, INC.; SUNRISE BANKS NATIONAL ASSOCIATION; AND PRAXELL INC.,<br><br>Defendants. | No. 2:18-cv-00315-R-MRW<br><br>**DECLARATION OF JOE RUDY REYES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION** |

I, Joe Rudy Reyes, hereby declare as follows:

1.      I am the Plaintiff in this case, I am over the age of 18 and competent to

testify as to the matters contained herein.  The statements contained herein are based on

1   my personal knowledge.

2       2.      After serving nearly thirty years in the California corrections system, I was

3

4   released on parole from High Desert State Prison in Susanville, California on Monday,

5   January 16, 2017.

6       3.      Early on the morning of my release from High Desert, a correctional

7

8   officer first handed me a change of clothes and all my release paperwork.  I was

9   nervous and eager to leave the prison, so I quickly signed the release form without

10

11  reading it, at which point the officer informed me that I would receive my inmate trust

12  account balance and state issued "gate money" on a prepaid debit release card.

13      4.      I asked the officer to instead receive my funds in cash, but the officer told

14

15  me that the prison "doesn't do that" and that they only release funds on prepaid JPay

16  Cards.

17      5.      Before this point, I was never informed that I would be receiving the

18

19  remainder of my prison account balance and my state-provided $200 "gate money" on a

20  prepaid debit card.  I presumed that I would receive these funds in cash.

21      6.      After signing the release form, I waited approximately two hours at the

22

23  High Desert facility before a van arrived to transport me to Reno, Nevada so I could

24  catch a bus to Sacramento.  During those hours, I read my release paperwork; I saw

25

26  nothing concerning the JPay Card, its fees, or its arbitration terms in my release

27  paperwork.

28

7.      A correctional officer then accompanied me as I was transported via van from the High Desert facility to the closest major bus depot in Reno, Nevada.

8.      There, the correctional officer waited with me until shortly before the next Sacramento, California-bound bus departed. I sat with a single box of my possessions as the correctional officer from High Desert watched over me.

9.      Just before the bus's departure, the correctional officer went to the bus depot ticketing window and purchased a bus ticket from Reno to Sacramento for me. The officer did not inform me that he would be buying my ticket before he did so, and I did not authorize the purchase.  The officer used the prison-issued JPay Card, a copy of which is attached hereto as **Exhibit A**, to purchase the ticket.

10.      It is my current understanding that the Card was issued by Sunrise Banks National Association and serviced by JPay, Inc. and Praxell, Inc.

11.      Needing my signature to complete the transaction, the officer beckoned for me to join him at the window and directed me to sign the transaction receipt.  It was then that the officer told me that I would be boarding a bus to Sacramento, where I would need to change to a bus or train to get to Los Angeles.

12.      As the Sacramento-bound bus prepared to leave the depot, the officer handed me my JPay Card in a plain, white sleeve.  There was no other envelope, and I do not believe there was any writing on the sleeve.

13.      I discarded the sleeve shortly after the officer handed me the JPay Card.

14.     The officer did not provide me with any other written materials concerning the Card.  The only additional information the correctional officer provided me about the JPay Card was to tell me that the last four digits of my California Department of Corrections number was also my PIN for the Card.

15.     I was not handed a green flyer explaining the JPay Card.

16.     I then boarded a Sacramento-bound bus.

17.     I do not believe I received any terms and conditions for the JPay Card.

18.     Before receiving the JPay Card, I was never informed that I would be receiving the remainder of my prison account balance and my state-provided $200 "gate money" on a prepaid debit card.  I presumed that I would receive these funds in cash.

19.     I did not elect to receive my funds on the JPay Card, and if given the choice, I would have preferred to receive my "gate money" and the balance of my inmate trust account in cash.

20.     I never asked for, or applied for, the JPay Card.

21.     I did not know, and did not have a reason to think, that taking the JPay Card was anything other than a means of getting my personal property and "gate money" upon my release.  I did not believe that, by maintaining a balance on my inmate property account and accessing my state-issued "gate money" or by accepting the JPay Card from a California Department of Corrections officer, that I could potentially be bound by a contract with another third party.

1

2

3

4

22.     No California Department of Corrections officer gave me an opportunity to reject the JPay Card or take immediate possession of my money in any other form, such as cash or check.

5

6

7

8

23.     I never agreed to receive the JPay Card instead of the balance of my inmate trust account and my gate money in cash, and never assented to the terms to any contract with Defendants.

9

10

11

24.     I did not sign any documentation agreeing to the JPay Card or any terms that may apply to it.

12

13

14

15

16

17

25.     I had no choice but to accept the already-activated and already-used JPay Card instead of the balance of my inmate trust account and my "gate money."  I could not meaningfully object to receiving the prepaid debit release card.  My receipt of the balance of my inmate trust account and my gate money in the form of the JPay Card was completely and utterly involuntary.

18

19

20

21

26.     After my release, I kept all my release paperwork together, and I did not receive any paperwork explaining the fee structure or arbitration terms for the JPay Card, including any "Cardholder Agreement."

22

23

24

27.     I was not told that the JPay Card imposed maintenance or transaction denial fees.

25

26

27

28.     I never received any notice of any arbitration clause associated with the JPay Card, and never agreed to arbitrate any claims against JPay, Inc., Sunrise Banks National

28

Association, or Praxell, Inc.

29.     No California Department of Corrections officer spoke with me about the purpose or importance of any terms and conditions related to the JPay Card.

30.     The Card was initially loaded with $424.20: $200 in state-issued "gate money" and another $224.20 in funds from my inmate trust account.

31.     Once I arrived in Sacramento, I went to the cashier window and used the Card to purchase a train ticket to Hanford, California, where I would meet my family.

32.     I then went to an ATM in the Sacramento bus depot, hoping to extract the Card's balance in cash.  The transaction was declined, and after trying once more, I gave up.

33.     I then left the station to find an open store nearby so I could buy something to eat.  At that point, I had not eaten or had a drink of water in over 12 hours.

34.     As it was a holiday, very few stores were open.  I went into a bail bondsman's shop, and asked where I could buy something to eat.  The bondsman then offered me a club sandwich, bottle of water, and cup of coffee.

35.     I then returned to the station, where I realized that I had missed my train.  I used the Card to pay a $15-20 fee and book a seat on the next Hanford-bound train.

36.     After securing a seat on the next train, I returned to the bail bondsman's shop, where I asked where I could purchase a prepaid cell phone.  One of the bondsman's employees escorted me to a nearby Metro PCS store, where I spent

approximately $60 on a cell phone and pre-loaded minutes, and then went to Subway to purchase a sandwich for the train ride to Hanford.

37.     Once in Hanford, I met my family and spent one night in town.  I then used the JPay Card to purchase a bus ticket to Los Angeles.

38.     Much of the JPay Card's balance was depleted in the first few days after my release.  The bus and train tickets from Reno to Sacramento and then from Sacramento to my home in Los Angeles used most of the balance.  I also used the card to purchase food and a cell phone within the first few days of receiving the JPay Card.

39.     Because my family gave me additional cash and a cell phone attached to my sister's cellular plan after my release, I did not use the JPay Card immediately upon my arrival in Los Angeles.  I waited several days before attempting to use the Card again.

40.     After spending approximately $350, I attempted to make a purchase at a retail store using the JPay Card.  My transaction was declined.

41.     After the sales clerk tried again without success to run the JPay Card, I paid for my items in cash instead.

42.     I then attempted to use the JPay Card at an ATM in a nearby 7-11 store. Again, my JPay Card was declined.

43.     I also tried to use the JPay Card to purchase a hot dog at the counter in the 7-11.  Again, the transaction was declined.

44.     I then called the customer support hotline listed on the back of the JPay Card later that evening.  The customer support service is operated by Praxell.

45.     I was told by a Praxell representative that my account had been frozen due to "suspicious activity."

46.     When I asked for an explanation as to what triggered their concerns, the Praxell representative told me that, as a third-party service provider, they could not answer my questions as to why the account was frozen and could only offer advice on how to regain access to the account.

47.     The Praxell customer support representative told me that I would need to provide a photocopy of the JPay Card itself and a copy of my driver's license to unfreeze the account.

48.     Because I had been released from prison less than a week before, I told the customer support representative that I did not yet have a driver's license.  The representative again reiterated that my account would not be reinstated until I provided them with a copy of the JPay Card and a valid driver's license.

49.     No representative explained how my drivers' license would confirm my identity for the JPay Card that did not have my—or any other—name on it.

50.     I obtained a California driver's license in mid-February 2017.

51.     Shortly after obtaining my driver's license, I again called the Praxell-operated customer support number to request access to my account.  A Praxell

representative told me to email copies of the JPay Card and my driver's license, and provided me with an email address to use.  The email account had a "praxell.com" address.

52.     I sent an email attaching copies of the Card and license, but I received no response to this email.

53.     A few days later, I called the Praxell-operated customer service number again.  I explained that I had emailed the requested documentation, and requested access to my account.

54.     I explained that I was asked to provide these required materials, and again requested reactivation of my JPay Card.

55.     This time, the Praxell customer support representative told me that I would need to provide a copy of a utility bill in my name, as well as the previously requested driver's license and JPay Card copy.

56.     No representative explained how a utility bill with my name on it would confirm my identity for the JPay Card that did not have my—or any other—name on it.

57.     After explaining that I did not have any utilities in my name, as I was living in transitional housing and did not directly pay for my utilities, the customer support representative said I could instead provide a copy of my cell phone bill.

58.     No representative explained how a cell phone bill with my name on it would confirm my identity for the JPay Card that did not have my—or any other—name on it.

1

2

3

59.    Because my sister paid for my cell phone through her family plan, I could not provide a cell phone bill to satisfy Praxell customer support's requirement.

4

5

60.    The Praxell customer service representative then told me that I could get a signed and notarized letter from my landlord attesting to my residence.

6

7

8

61.    No representative explained how a letter attesting to my residency would confirm my identity for the JPay Card that did not have my—or any other—name on it.

9

10

11

12

13

62.    On May 30, 2017, after I obtained a signed, notarized letter from my landlord, I again called the Praxell-operated customer support line and asked how I could regain access to my JPay Card account.  I was told to email copies of the letter, my Card, and my driver's license to a provided "praxell.com" email address.

14

15

63.    That same day, I emailed the requested documents to the provided address.

16

17

18

19

64.    On May 31, 2017, a representative from the Praxell-operated JPay Card Support responded via email, and told me that I would "need to contact the facility which released [me] concerning [my] JPay Card."

20

21

22

65.    No representative explained how High Desert Prison, whose officials would have no access to any information about my JPay Card, could reactivate my account.

23

24

66.    Not understanding how High Desert Prison would have any way to reactivate the JPay Card, I grew increasingly frustrated.

25

26

27

67.    Shortly after this email exchange, I spoke with the Warden of High Desert Prison.  Due to my work on behalf of the Inmate Advisory Council, my continued work

28

to improve the prison's conditions from outside its walls, and my involvement with the

Anti-Recidivism Coalition, I speak with the Warden frequently.

68.    I mentioned my problems regaining access to my JPay Card account, and

that I had been told to contact the prison to reinstate my account.

69.    The Warden insisted that the prison had nothing to do with the JPay Cards

after an inmate's release, and that JPay handles everything regarding the Cards.

70.    Left without options and with the Praxell-run JPay Card Support team

insisting that I needed to turn to the prison, which I knew could not grant me access to

my account, I gave up.

71.    After reading Defendants' Motion to Compel Arbitration, I have since

learned that my account was suspended because Defendants claim that, on January 19,

2017, another JPay Card user, Frank Cardova, indicated to a Praxell customer service

representative that he had my JPay Card.

72.    Though I repeatedly called JPay's customer service number, no Praxell

customer service representative explained this to me.

73.    I do not know a Frank Cardova.

74.    I did not give this person my JPay Card or JPay Card number.  I still have

my JPay Card.

75.    With my account frozen, I had access to neither my remaining JPay Card

balance nor an accounting of my transactions and fees.

76.    Customer service representatives for my JPay Card account refused to reinstate my account, or provide me with the exact account balance.

77.    On January 8, 2018, I again called the Praxell-operated JPay customer service number. After providing my JPay Card number, an automated system told me that my account had been closed.  I do not know when, between May 31, 2017 and January 8, 2018, Defendants closed my account.

78.    After reading Defendants' Motion to Compel Arbitration and reviewing their provided transaction history for my JPay Card, I learned that the Card's balance was "unloaded" on March 12, 2018. There is no notation on the provided transaction history explaining why my account was "closed" between May 31, 2017 and January 8, 2018.

79.    At the time my account was frozen, it was my understanding that I had approximately $80 remaining on the JPay Card.  This was an approximation because I was unable to access my JPay Card balance for the reasons described above.

80.    After reading Defendants' Motion to Compel Arbitration and, for the first time, seeing an accounting of my transaction history, I learned that I had $71.19 left on my JPay Card when my account was frozen.

81.    I was not aware of any arbitration terms that may apply to the JPay Card when I received the Card or at any time after I used it.

82. I did not receive the JPay Card, or any paperwork associated with it, prior to the officer purchasing the ticket and then handing me the JPay Card in a white sleeve.

83. Apart from the JPay Card, I had no other funds or means to purchase my bus and train tickets in the hours after my release.

///

///

///

///

///

///

///

///

///

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 9th day of April, 2018, at _Van Nuys_, California.

_____
Joe Rudy Reyes